# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 10, 2004

## STATE OF TENNESSEE v. RONNELL JASON LEBERRY

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40000370     John H. Gasaway, III, Judge**

---

### No. M2003-01228-CCA-R3-CD - Filed March 28, 2005

---

A Montgomery County jury convicted the Defendant, Ronnell Jason Leberry, of aggravated assault, extortion, especially aggravated kidnapping, and two counts of facilitation to commit aggravated rape. The trial court sentenced the Defendant to an effective sentence of thirty-two years and six months. On appeal, the Defendant contends that: (1) the trial court erred when it failed to instruct the jury on accomplice testimony; (2) he was denied a unanimous jury verdict; (3) the trial court erred by failing to recuse itself; (4) the evidence is insufficient to support his convictions; (5) he was denied his right to an impartial jury because certain jurors considered evidence not admitted at trial; (6) the trial court erred by failing to recuse the Assistant District Attorney General at trial; (7) he was denied the right to a fair trial because he was required to wear leg-shackles during the trial; (8) he was denied a fair trial due to the racial composition of the jury; and (9) the trial court erred by enhancing the Defendant's sentences and ordering consecutive sentencing. After thoroughly reviewing the record, we affirm all of the Defendant's convictions. Further, we hold that the trial court improperly enhanced the Defendant's sentences in light of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), and we reduce the Defendant's sentences in accordance with this opinion to an effective sentence of twenty-eight years.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part and Remanded

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES, and NORMA MCGEE OGLE, JJ., joined.

Hugh Poland (at trial); and Mark Olson (on appeal), Clarksville, Tennessee, for the appellant.

Paul G. Summers, Attorney General and Reporter; Richard H. Dunavant, Assistant Attorney General; John W. Carney, Jr., District Attorney General; Arthur Beiber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Facts

This case arises from sexual offenses that occurred against the victim, J.B,[1] on May 15, 2000. With respect to these crimes, the Defendant was indicted for seven counts of aggravated rape, aggravated assault, extortion, and two counts of especially aggravated kidnapping, and he was convicted of aggravated assault, extortion, especially aggravated kidnapping, and two counts of facilitation of aggravated rape. The trial court sentenced the Defendant to an effective sentence of thirty-two years and six months.

The following evidence was presented at the Defendant's trial. The victim testified that she worked at a computer parts store around the time of this crime, and she usually car-pooled to work with her roommate, Lynequia Hawkins, or a member of Hawkins's family, or her friend, Demetris ("Dee") Grant. The victim testified that Grant had a boyfriend named "Chug," who she identified as the Defendant. She explained that the Defendant is Hawkins's brother.

The victim said that she usually drove her own car to work, which was a 1990 Mustang. On Saturday, May 13, 2000, she was scheduled to work, and she car-pooled to work with Hawkins. The victim testified that she was also supposed to take Grant to work, but she did not do so. She said that, on the next day, Sunday, May 14, 2000, she spent the day at her mother's and then returned to her apartment around 11:00 p.m. She explained that, when she returned home, Hawkins's mother's truck was outside, and she thought it was unoccupied. A short time later, she saw Grant and the Defendant get out of the truck, and Grant said that "she was going to kick [the victim's] ass" because the victim did not take her to work. The victim said that Grant told her "to go inside to talk," and, when she went into her apartment with Grant, the Defendant was there too. She testified that Grant swore at her, hit her in the face with a closed fist, and kicked her. She said that the Defendant talked to Grant, but she did not know what they said. The victim testified that either Grant or the Defendant then told her to undress. She testified that Grant said that she would hurt the victim with a knife, that the victim described as having a serrated blade, if the victim did not do what they said. The victim said that she undressed because she was scared that she was "going to die."

The victim said that the Defendant and Grant took turns "heat[ing] up a fork over the stove and burn[ing] [her] breasts and [her] vagina" while she was lying on her back on the floor. She testified that one breast "had a fork burn on the nipple and the other one was just below the nipple." The victim testified that either the Defendant or Grant inserted a mop handle into her vagina. She said that she did not remember any specific conversations between the Defendant and Grant, but she remembered them swearing. The victim testified that Grant and the Defendant forced her, by threatening her life, to "write a note saying that [she] owed [them] two hundred and fifty dollars and until [she] got them that money, then [her] car was as collateral." She said that she did not think that she owed either the Defendant or Grant any money. The victim said that she did not know if her clothes were on at this time, but she remembered that either the Defendant or Grant told her to get dressed, and she put all her clothes on except for her bra, which she left on the kitchen floor.

---

[1]It is the policy of this Court to refer to victims of sexual offenses by their initials only.

The victim testified that she, Grant, and the Defendant left the apartment. She said that Grant drove the Defendant's mother's truck, and the Defendant followed Grant, driving the victim's car with the victim in the passenger's seat. She explained that she got into her car with the Defendant because the attackers again threatened her life. She said that she and the Defendant followed Grant to a gas station, Scott's Market, but, because there was a police officer at the gas station, the Defendant kept driving. The victim testified that the Defendant circled back to the gas station, but Grant was not there, and the Defendant drove to Grant's apartment. When they arrived, the Defendant yelled that "if anybody wanted their d*** sucked or to have sex, to come there." The victim said that there were men who heard the Defendant, and these men went with her and the Defendant inside Grant's apartment. She said that, once inside the apartment, the Defendant and Grant again threatened her and told her to undress, which she did. She said that, after undressing, she was forced to have oral sex with multiple men, who were sitting on a piece of furniture. She said that there was a light on in the kitchen, where she could see both the Defendant and Grant, but there were no lights on in the living room, so she could not see how many men she had oral sex with. The victim said that she only stopped having oral sex with the men because "[the Defendant] asked them all if they w[ere] all satisfied and they said 'yes.'" The victim said that she was in the kitchen, and she vomited on Grant because she "was burned and [she] was sick and [she] was scared." Grant yelled at the victim to "clean it up," and Grant had a "pail of water and a mop and [the victim] cleaned [the vomit] up with that."

The victim testified that, while in Grant's apartment naked, she was forced to do jumping jacks, sit-ups, and to stand in the corner with one leg raised, all of which she did because her life was threatened. She said that the Defendant and Grant told her to get dressed and to leave, which she did. The victim said that she did not know anyone in the apartment complex, but a man who she did not know took her home. When she got home, her mother and stepfather were there, and she told them, while crying, that she had been raped. The victim said that her parents told her that they were going to call the police, and she told them not to because she was scared that the Defendant and Grant would come and get her. The victim testified that her mother and stepfather took her to the emergency room at Memorial Hospital, but she had no memory of this hospital visit. She said that she was in pain for months after this incident and explained that "[t]he breasts, they healed quick[er] than [the] vagina did." The victim testified that her memory of the entire incident is "not very good" because she has "blocked it out of [her] mind." On cross-examination, the victim testified that, at the time of the incident, she had only known the Defendant for a couple months, and she had previously had intercourse with him. She conceded that she had previously testified that Grant burned her breasts and picked up the knife.

James Bryant Huggins, the victim's stepfather, testified that he had known the victim for almost three years. He said that, on Monday, May 15, 2000, the victim arrived at his house in the early morning and knocked at the door. Huggins said that the victim was shaking, crying, and scared, and, when he saw that she was crying, he woke up the victim's mother. He said that, after he awoke the victim's mother, the victim told them that she had been raped, and the victim's mother told her to call the police. Huggins said that the victim refused because she said that her attackers

would kill her if she called the police. He said that he and the victim's mother convinced the victim to go to the emergency room.

Lynequia Hawkins testified that she is the Defendant's sister. She testified that, at the time of the offenses, she and the victim had been roommates for six months, and they car-pooled to work together. She said that Grant was the Defendant's girlfriend in May of 2000. Hawkins testified that the victim and the Defendant had previously had sexual intercourse. She said that, on Saturday, May 13, 2000, she, her mother's boyfriend, and the victim went to work in the victim's car. She said that they had overslept and were late to work, so, even though they were supposed to drive Grant, they never picked her up because the victim "didn't like her." Hawkins testified that she saw Grant the following weekend, and Grant threatened the victim because the victim did not pick her up.

Hawkins testified that, on Sunday, May 14, 2000, she returned to her apartment around 1:00 a.m., and all the lights were on, the door was unlocked, and the phone was not on its charger, all of which were unusual. She said that there was no one in the apartment, and she did not see any cars or trucks in front of the apartment. Hawkins testified that she smelled an unusual odor when she entered the apartment that was similar to "something freshly burned," and she noticed the victim's bra on the kitchen floor. Hawkins testified that she had recently purchased a long mop that was white and green on the bottom, and she had both knives and forks in her home. Hawkins identified burned pieces of the mop that she found on her kitchen floor, which she did not clean up because she was tired. She said that she did not change anything in the kitchen and went to sleep, and she awoke round 6:00 a.m. to find the police at her door.

Gary Hodges, a detective with the Clarksville Police Department, testified that he was called to the victim's apartment on May, 15, 2000, and he photographed the crime scene and searched for possible evidence. He said that he found a mop in the kitchen, and he found some burned pieces of the mop on the kitchen floor.

Matthew Slight, who was an officer with the Clarksville Police Department at the time of this incident, testified that he assisted in this investigation. He said that, while he was walking on the sidewalk near the victim's apartment, he found a fork with black markings laying in the grass approximately twelve feet from the door of the victim's apartment. Rick Stalder, a sergeant with the Clarksville Police Department, testified that he searched the victim's apartment, and he found a knife on the kitchen counter that had a wood handle and a serrated edge.

Larry Boren, a detective with the Clarksville Police Department, testified that he searched Grant's apartment, and he found the victim's car parked near her apartment, which he found suspicious. Nicholas Newman, an investigator with the Clarksville Police Department, testified that he learned that the victim had told police that Grant stopped at a gas station, and he obtained the surveillance video from the gas station, which showed a woman who looked like Grant in the store. Danny Bryant testified that he was the manager of Scott's Market and he provided police with a surveillance video from the night of May 14, 2000, to the morning of May 15, 2000.

Latasha Duncan testified that, in May of 2000, she lived next door to Grant. She said that on May 15, 2000, she heard a car pull up around 1:00 a.m., and she heard the Defendant yelling that he had a "white girl" who wanted to engage in oral sex. She said that his voice was loud enough that she could hear it from the street to her apartment. Duncan testified that, out of curiosity, she got out of bed and looked outside and saw the Defendant in a maroon Mustang with a girl that she did not know. Duncan testified that she saw other men outside "hanging out," one of whom was the boyfriend of her friend, Nisha Buck. She said that she went to Buck's apartment, which is located in the lower set of buildings, and, when she arrived, she told Buck what was happening. She and Buck went back up to Duncan's apartment and sat on the porch for about forty-five minutes to an hour. She explained that no one was outside when they returned to her apartment, and she and Buck were waiting to see if Buck's boyfriend was going to come outside. She said that the Defendant and Grant came outside and asked them why they were "worried about" what was going on in Grant's apartment. Buck replied that she was worried because her boyfriend was inside Grant's apartment. Grant confirmed that Buck's boyfriend was in the apartment, and she asked if Buck would like her to retrieve her boyfriend, and Buck responded "no." Duncan testified that the Defendant mentioned that he had a double-barreled shotgun, and Buck said that she was only worried about her boyfriend. She said that the Defendant and Grant went back into the apartment, and, shortly thereafter, Buck's boyfriend came outside. Duncan testified that she never saw the "white girl" come out of Grant's apartment, and she did not know what time she went back to her apartment. She testified that, the whole time, all she heard was music.

Dr. Robert Doty, an emergency medicine physician testified, as an expert, that he conducted the victim's general examination when she came to the emergency room. Dr. Doty testified that his examination of the victim revealed the following: a small abrasion on the forehead; burns on both breasts; bruises to the lower interior knees; a bruise on the left part of the pelvis; a bruise on the left forearm; and a bruise on the right shoulder. Dr. Doty testified that the abrasion on the forehead and the bruises on the arms and knees "were progressing," which indicated that they were a few hours old at the time of the examination. He testified that he thought that the victim's breasts had been burned between twelve to twenty-four hours prior to his examination, and the burns "were in the perfect shape of a dinner fork." He testified that the burns on that area would be extremely painful.

Dr. Doty testified that he was unable to administer a pelvic examination because of the severity and extent of the victim's injuries. He was, however, able to look at the labia, which were reddened and swollen to the point that the opening was swollen shut. Dr. Doty testified that second-degree burns on the labia were "the cause of the swelling and discoloration to the area." He estimated that the burns had occurred within twenty-four hours of his examination. Dr. Doty testified that these burns would also be extremely painful. Dr. Doty testified that he and his nurse attempted to do a rape kit on the victim, and the nurse obtained the victim's medical history, as part of the rape kit. He described the victim's emotional condition as "extremely anxious." Dr. Doty testified that the victim indicated on her rape kit questionnaire that both fellatio and anal penetration had occurred. Dr. Doty testified that the victim's most pressing medical need was to be anesthetized to allow the insertion of a catheter to avoid other medical complications.

Dr. Lisa McIntosh, a physician specializing in obstetrics and gynecology, testified that Dr. Doty contacted her in May of 2000 to examine and treat the victim. She said that, when she arrived at the hospital, the victim was in the emergency room. She testified that the victim had "suffered second-degree burn injuries to her vulva, which is the area surrounding the vagina." She said that the victim's large "labia on either sides of the vagina were probably about three times swollen," and the small labia "were completely adherent together," which obstructed the urethra and prohibited urination. She said that the urethra appeared to be infected and blisters, located on the vulva, had ruptured exposing the soft tissue and looking "like the entire genital area had been peeled of its skin."

Dr. McIntosh testified that these injuries must have been "excruciatingly painful" because the victim would not allow her to touch the area, and the victim appeared to be in shock. She testified that she had to give the victim general anesthesia before she could conduct a pelvic examination because the injuries were so extensive and to such a sensitive area. Dr. McIntosh testified that, after the anesthesia was given, she did a general examination to determine if there was any trauma to the inside of the vagina. She said that the victim's vagina had "a bloody discharge" and a "pooling of vaginal secretions." She testified that there was an abrasion, a scratch, and a bruise, about the size of her thumbnail, on the victim's cervix that encompassed about a third of the cervix. Dr. McIntosh testified that this bruise was not consistent with traditional intercourse and was more likely caused by "[s]omething hard [entering the vagina] . . . with some force." Dr. McIntosh testified that, during the surgery, she cleaned the wounds with "excruciating detail" and covered the area with burn ointment. Dr. McIntosh testified that she removed a hair that she found at the top of the patient's cervix, and the hair indicated that the victim had recently had intercourse. She testified that she also found and removed some secretions inside the victim's vagina, and she gave the secretions to the police officer. She said the victim tested positive for gonorrhea. She said the victim was unable to urinate for a week, and the catheter was removed about a week later.

Dr. McIntosh testified that she performed a second surgery on the victim, that related to the same injury to remove the dead tissue around the burn to get the blood supply back to that area. She testified that the victim's labia was elongated by two or three times, and it had a hole the size of the doctor's finger that penetrated the labia. The doctor opined that the elongation and hole were caused by a burn. The doctor concluded that the burning instrument did not penetrate the victim's vagina. Dr. McIntosh testified that she had to cut and reattach the right labia to the vulva, but she was unable to reconstruct it to its normal appearance and function. She said that there would probably be permanent damage to that area. On cross-examination, Dr. McIntosh testified that she could not determine the color or the shape of the hair found in the victim, and she could not determine if the hair came from the victim or from another source.

Demarcus Smith testified that, in May of 2000, he was fifteen years old, and he was near Grant's apartment on May 14 and 15. He said that he went into the apartment where he saw the Defendant, Grant, and three other men, "Mont," "Rail," and Walter Young, Jr. Smith testified that, when he entered Grant's apartment, he thought that he saw Young and "Mont" getting oral sex, but he was unsure who was involved. Smith testified that he was inside the apartment for about fifteen

to twenty minutes. He said that Young and "Mont" were having sex with the victim at the same time, and they were "taking turns" having her perform oral sex on them. Smith testified that they were in the living room, and the lights were off, but he was able to see what was happening because there was a light on in the kitchen. He said that he went into the kitchen where Grant, the Defendant, and "Rail" were sitting, and they talked for a short time before he left. He said that he thought he saw the victim vomit in the sink, and she probably cleaned it up because "she made the mess." He testified that, as he was leaving, the victim came running naked out of the house. He said that the Defendant told the victim to "kiss" Smith's penis, but the victim never touched him. He testified that the victim ran after him, and she wanted him to let her "kiss" his penis. Smith testified that the victim was "shaking," but he did not notice any unusual marks on her body. On cross-examination, Smith testified that he did not have a good memory about what happened on that night.

Demetris ("Dee") Grant testified that, in May of 2000, she was living with the Defendant and her two children. She said that she was working in Lavergne, Tennessee, and she usually rode to work with the Defendant's grandmother. She said that the victim was supposed to take her to work on Sunday, May 14, 2000, but the victim did not pick her up or call her. She said she called the victim and asked her if she was coming to get her, and the victim said that she was on her way, but she never arrived. Grant testified that the Defendant's grandmother took her to work late, which caused her to lose money. She said that the Defendant's grandmother gave her a ride home from work and took her to get groceries, while the Defendant washed their clothes at the victim's apartment. Grant testified that she went with the Defendant and her children, in the Defendant's grandmother's truck, to the victim's apartment to pick up the clothes on the night of May 14, 2000. She said that her children were asleep in the truck, and the victim was pulling up to the apartment and going inside when she arrived.

Grant testified that, when she saw the victim, she asked her why she did not come and pick her up, and the victim "laugh[ed] about it" and thought it was funny. She said that she argued with the victim, and she "picked up a knife off the table and [she] called [the victim] a bitch" and told the victim that she would "kick [her] ass." She testified that she then put the knife down and slapped, kicked, and fought the victim. Grant testified that she was not sure how many times she hit the victim, but, when she pushed the victim, the victim hit the refrigerator and fell. She said that she stood there for a minute and kicked her and then said "now, you don't think its funny any more . . . ." She testified that the victim started to get back up, and the Defendant said "no, you know, since she thinks everything is funny, I am going to show her funny." Grant testified that the Defendant told the victim to get undressed, and she did. She said that she lit a cigarette on the stove, and the Defendant handed her a fork and told her to "warm it up," and then he took the fork and touched both of the victim's breasts with the hot fork. She testified that the victim "squirmed," "kind of shook," and screamed when the fork touched her skin. She said that she "could hear it kind of sizzle because it was a hot fork." Grant said that the victim then said to "please stop" because she did not think it was funny anymore, and Grant did not say anything because she was "somewhat in shock." She testified that she heated the fork the first time, but the Defendant heated the fork the second time. She said that the victim's reaction to the second burn was similar to the first burn, and she heard the "sizzle sound," and the victim screamed.

Grant testified that the victim was "standing up shaking," and the Defendant told her to "get on the floor." Grant testified that the victim got onto the floor in a sitting position, and the Defendant told the victim to lay on her back and "to bend her legs." She said that the Defendant "stuck the fork back over the fire," and he took the fork and "stuck the fork inside of her," and the victim screamed. She testified that she tugged on the Defendant's arm and told him to stop but the Defendant said "no, she thinks it is funny and I will show her funny." Grant testified that the Defendant later threw the fork in the "backyard" where they were parked. She testified that the Defendant took a broom or mop that had a black handle, and he put it inside the victim's vagina slowly, and it reminded her of sex. The victim was "squirming at that point." She testified that the Defendant took the broom out and showed it to her and there was "a secretion on [the mop] from [the victim's] vagina," and the Defendant said "look at the color [of] it. She has a sexual transmitted disease." Grant testified that the Defendant again inserted the mop into the victim's vagina, and this time "he shoved it hard and it made her scream." She testified that the Defendant then gave the mop to her, and she was holding it while the Defendant poured bleach over the mop over the sink. She said that she had been in a lot of fights in her life, and she started this fight, which she would not have done had she known what would happen. Grant testified that she never burned the victim's breast with a hot fork, she never inserted the mop handle into the victim's vagina, and she never burned the victim's genitals with the heated fork.

Grant testified that the Defendant told the victim to get up and get dressed. She said that the Defendant talked about the victim paying Grant back for missing work, and the victim stated she would pay whatever they wanted. She testified that the Defendant told the victim to write on paper that Grant could keep the victim's car until the victim paid her. She said that the Defendant wanted his name on the paper also because he would be the one driving the car. She testified that the victim said, both during and after the argument, that she was going to pay them. Grant said that she did not remember the exact amount for the notes.

Grant testified that, after the victim wrote the notes, the Defendant said that he wished he "knew where Rail and [his friends] w[ere]" so that the victim could perform oral sex on them. She said that "Rail's" given name is Robert Wilson, and he is the Defendant's cousin. Grant testified that she got in the truck, and the Defendant told her to stop and get gas. She said that it was the Defendant's idea to go to her apartment because the Defendant wanted the victim to give his friends oral sex. She testified that she did not want any of this to happen, but she did not say anything because she did not want the Defendant to do to her what he was doing to the victim. Grant testified that, when she got into the truck, her children were still asleep, and she drove to the gas station. She said that the Defendant drove the victim's car, and the victim was in the passenger's side of the car. She testified that, as they reached the gas station, there was a police car, and the Defendant stopped next to the store and told her to go and get gas. She said that, when she left the gas station, she did not stop at the police station because her children were asleep, she did not know where the police station was, and she was trying to do what the Defendant wanted.

Grant testified that, after they left the gas station, they went to her apartment, she parked the truck, and the Defendant went up the street to where some men were standing. She testified that the

Defendant said "[the victim] was going to give . . . some free [oral sex]." She said that she took her children inside the house and into their room. Grant testified that she went downstairs, and the Defendant met her on the stairs, gave her a kiss, and told her to go to the kitchen. She said that she went to the kitchen with the Defendant and sat on his lap, and some other men walked into the apartment. She testified that she, the Defendant, "Rail," Chris, and "Little Mont" all smoked marijuana together in the kitchen while the victim was in the living room. Grant testified that she could hear guys laughing and talking, and a man named Fred "came in the kitchen and he said 'man, I am in there trying to get a nut and [Young] is in there making love to her.'"

Grant testified that she went into the living room, and she saw Fred and some other men on the couch, Young on the love seat, and "Fred was having sex with [the victim] from behind." She said that Young was "waiting to get some more oral sex from [the victim] and sex." She testified that she saw, at a different time, the victim giving Young oral sex. Grant testified that she saw the victim give "Kerry" and "Little Monty," or Marcus, oral sex. She said that "Little Monty" was getting ready to leave, and the Defendant asked him if he was "sure [he] got enough" and to "[g]o get you some more head." She testified that, as "Little Monty" was leaving, the Defendant told the victim to "go and give the man some more head." She said that the victim followed "Little Monty," and she asked him "you want me to suck your d***," and he responded "no," but the victim, who was naked, followed him outside the door. Grant testified that "Little Monty" was a younger guy, around fifteen or sixteen, and she did not know his real name. Grant testified that the victim vomited in her kitchen and on Grant. She said that the Defendant told the victim to clean it up, and he told Grant to go upstairs and change.

Grant testified that she asked the Defendant to stop, and he said no "because [the victim] thought it was funny." She said that she did not want these things going on in her house, with her children upstairs. She testified that the Defendant told the victim to do some sit-ups, and, after the victim stopped doing sit-ups, "she went back to giving oral sex." She said that she asked the Defendant if the victim could get dressed, and "he finally let her get dressed." She testified that the Defendant was going to take the victim home, but "Kerry" asked if she needed a ride, and the Defendant told "Kerry" to give her a ride home. She said that, as far as she knew, the victim left with "Kerry," and she did not know what happened to the victim after that.

Grant testified that, after the victim left her apartment, the other men also left. She said that she was talking with the Defendant, and she told him that "this isn't right," and he responded "well, yeah, come on, you're right." She testified that she and the Defendant then left in the victim's car, dropped her kids off, and then just rode around, stopped for food, and then went back to her apartment. She said that it was getting light outside when they returned to her apartment, and they got out of the victim's car and into the Defendant's mother's truck, and rode around some more. Grant testified that she did not try to contact the police after the victim left because she was afraid of the Defendant. Grant testified that she was charged with these crimes, and she pled guilty to kidnapping. She agreed that a condition for her ten-year sentence was that she tell the truth, which she had done.

On cross-examination, Grant testified that she did not tell the police what happened until she gave a statement the week before trial. She said that she has been incarcerated since she was arrested, and the Defendant could not get to her in jail. She testified that, anytime during the last nine months, she could have contacted the police and told them that she was innocent, and the Defendant was guilty, but her attorney told her not to speak with anyone. She admitted that, had her case gone to trial, she would have been tried on the same charges as the Defendant: four counts of aggravated rape; two counts of especially aggravated kidnapping; one count of aggravated assault; and one count of extortion. Grant testified that her lawyer told her that "the worst case scenario" would be one hundred sixty years in prison, and her decision to plead guilty was based on her attorney's advice. She said that she and the Defendant had been dating a couple of months at the time of these events. She testified that the Defendant told her that he had previously had sex with the victim. She said that she was angry with the victim for lying to her about not picking her up for work on May 13, 2000.

Christy Clinton testified that, on May 14, 2000, she lived next door to the victim. She said that, on that evening, she came home, and, as she was got out of her car, she saw the victim pull up in her car hurriedly. She said that she saw the victim "jump out" of her vehicle and run into the house, and the Defendant and his girlfriend, Grant, arrived in a truck. She testified that Grant exited the Defendant's vehicle, and she appeared upset "about a ride and . . . [the Defendant and the victim] having sex before." Clinton testified that Grant began to argue with the victim outside of the victim's apartment, and the argument continued as they walked into the apartment. She said that, as the victim and Grant entered the apartment, she heard "[s]creaming and begging" from inside the victim's apartment. She stated that the victim was "screaming bloody murder," and she was positive that this noise came from the victim's apartment. Clinton testified that, during this argument, the Defendant was outside in the truck. She said that the Defendant then went into the apartment where the victim and Grant were arguing. She testified that, after the Defendant went into the apartment, she did not hear screaming but, rather, "[m]ore like moaning."

On cross-examination, Clinton testified that she called the police when she heard the screaming, and she called the police again when there was no noise. She said that she did not know if there was anyone in the apartment the first time she called the police. Conversely, she testified that she never called the police when she heard the screams from the apartment. She clarified that she made the first call to the police as the people in the victim's apartment were leaving. Clinton testified that she refused to give her name to the police, and she told the police that she "did not want to be involved." She testified that she was upset when the police discovered her name and came to interview her because she did not want anyone to think she was a "snitch."

Based upon this evidence, the jury found the Defendant guilty of two counts of facilitation to commit aggravated rape, aggravated assault, extortion, and especially aggravated kidnapping. The trial court sentenced the Defendant, as a Range I standard offender, at thirty percent, as follows:

Count 1, facilitation to commit aggravated rape, a Class B felony, ten years
Count 2, facilitation to commit aggravated rape, a Class B felony, ten years

Count 4, aggravated assault, a Class C felony, six years

Count 5, extortion, a Class D felony, four years

Additionally, in Count 6, especially aggravated kidnapping, a class A felony, the trial court sentenced the Defendant to twenty-two years and six months, as a violent offender. The trial court ordered the sentences for facilitation to commit aggravated rape, aggravated assault, and extortion to run concurrently with each other, but consecutively to the especially aggravated kidnapping conviction, for an effective sentence of thirty-two years and six months.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it failed to instruct the jury on accomplice testimony; (2) he was denied a unanimous jury verdict; (3) the trial court erred by failing to recuse itself; (4) the evidence is insufficient to support his convictions; (5) he was denied his right to an impartial jury because certain jurors considered evidence not admitted at trial; (6) the trial court erred by failing to recuse the Assistant District Attorney General at trial; (7) he was denied a fair trial because he was required to wear leg-shackles during the trial; (8) he was denied a fair trial due to the racial composition of the jury; and (9) the trial court erred by enhancing the Defendant's sentences and ordering consecutive sentencing.

## A. Accomplice Jury Instruction

The Defendant asserts that the trial court committed reversible error when it failed to instruct the jury on the law regarding accomplice testimony. A criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). An accomplice is a person who knowingly, voluntarily and with a common intent unites with the principal offender in the commission of a crime. State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). This Court has stated:

> The question of who determines whether a person is an accomplice depends upon the facts of each case. When the facts of a witness' participation in a crime are clear and undisputed it is a question of law for the court to decide. When such facts are in dispute or susceptible of an inference that a witness may or may not be an accomplice, it then becomes a question of fact for the jury to decide.

State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990); Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978). Whether the testimony of an accomplice has been sufficiently corroborated is a question for the jury. State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). However, corroborating evidence need not be sufficient in and of itself to support a conviction, but it must fairly connect the defendant with the commission of the crime. State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992). In the absence of a special request, the trial court does not err by failing to instruct the jury about accomplice testimony even if the circumstances of the case warrant such an instruction. State v. Anderson, 985 S.W.2d 9, 17 (Tenn. Crim. App.

1997); see also State v. Roy Chisenhall, No. M2003-00956-CCA-R3-CD, 2004 WL 1217118, at \*9-10 (Tenn. Crim. App., at Nashville, June 3, 2004), *no perm app. filed*.

At the motion for new trial hearing, the court found, "The evidence of [the Defendant's] guilt as to each count for which he was convicted, was compelling evidence and the omission of the accomplice instruction even if erroneous was . . . harmless." We conclude that the trial court did not err by failing to instruct the jury on accomplice testimony. First, we note that the Defendant was not convicted solely on accomplice testimony, and there were multiple other witnesses to the Defendant's actions, including the victim, who also testified. The jury accredited and based the Defendant's conviction, at least in part, upon, the victim's testimony. Grant, the accomplice, corroborated much of the victim's testimony, and she provided more detail about some of the crimes. Furthermore, the Defendant failed to request an accomplice testimony instruction. Under these circumstances, as stated above, although an instruction on accomplice testimony would certainly have been warranted considering the testimony of Grant, we conclude that any error by the trial court with regard to this issue is harmless. This issue is without merit.

### B. Unanimous Verdict

The Defendant contends that the jury did not unanimously convict him for two reasons. First, the trial court did not ensure a unanimous verdict because it did not properly poll the jurors on counts one and two. Second, the State failed to elect facts upon which it was relying for the two counts of rape. The State contends that the record shows that the jurors were polled for both counts. Further, the State asserts that counts one and two did not require election.

### 1. Jury Poll

Tennessee Rule of Criminal Procedure 31(d) provides "[w]hen a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll, there is not unanimous concurrence the jury may be directed to retire for further deliberations or may be discharged." Tennessee appellate courts have concluded that "no particular form of answer is essential on the polling of a jury, it being sufficient if the answer of the juror . . . indicates with reasonable certainty that the verdict is his [or her] own." See Dixon Stave & Heading Co. v. Archer, 40 Tenn. App. 327, 291 S.W.2d 603, 608 (1956); see also State v. Clayton, 131 S.W.3d 475, 479 (Tenn. Crim. App. 2003).

Initially, we note that, in the case under submission, the Defendant did not request that the jury be polled. The trial court did, however, poll the jury in the following exchange:

THE COURT: All right. Ladies and Gentlemen, let me get an indication of your – of your agreement. I'll take these one at a time. As to count one, guilty of facilitation of aggravated rape. Is this the verdict of each of you; if so raise your hands.
(All jurors raise their hands.)

THE COURT: The verdict is unanimous. Count two guilty of facilitation of aggravated rape. Is this your verdict?
(Some jurors raise their hands and other jurors say: Yes.)
THE COURT: You either have to – you have to raise your hands. I'm getting an indication for the record.
(All jurors raise their hands.)
THE COURT: Let the record reflect it is unanimous.

The trial court proceeded in the same manner to determine that the jury's verdicts as to all the additional counts were also unanimous. Clearly, based on the record, the jurors were polled to determine that their decision was unanimous for each count. Therefore, this issue is without merit.

## 2. Election of Offenses

The Tennessee Supreme Court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citing State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993)). The election requirement "safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Id. at 631 (citing Brown, 992 S.W.2d at 391); see Kendrick, 38 S.W.3d at 568. The Tennessee Supreme Court explained that "'[a] defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a "patchwork verdict" based on different offenses in evidence.'" Kendrick, 38 S.W.3d at 568 (quoting Shelton, 851 S.W.2d at 137). Moreover, the election requirement serves other interests as well: "it enables a defendant to prepare for a specific charge; it protects a defendant against double jeopardy; it enables the trial court to review the weight of the evidence in its capacity as thirteenth juror; and it enables the appellate court to review the legal sufficiency of the evidence." Id.

"The necessity of requiring the State to make an election of the particular offense it will rely on for conviction . . . is . . . fundamental, immediately touching the constitutional rights of an accused, and should not depend upon his demand therefor." Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). Although the federal constitution's requirement of unanimity among jurors has not been imposed on the states through the Fourteenth Amendment, "there should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution." State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). The Tennessee Supreme Court held that "where the indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible," but, at the close of proof, the State must elect the facts upon which it is relying for conviction. State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994).

The requirement of election and a jury unanimity instruction exists even though the defendant has not requested them. Burlison, 501 S.W.2d at 804. Failure of the State to elect offenses when the proof requires an election is considered an error of constitutional magnitude and will result in reversal of the conviction, absent the error being harmless beyond a reasonable doubt. See State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000); Shelton, 851 S.W.2d at 138-39.

In this case, the Defendant contends that counts one and two are separate allegations of aggravated rape and the State failed to elect facts upon which it was relying to support these convictions. The indictment, which the State read to the jury at the beginning of the trial, set forth the charges as follows:

**COUNT 1:**

That on or about the 14th day of May, 2000, and in the State and County aforesaid, **RONNELL JASON DUPREE LEBERRY** . . . unlawfully, feloniously, intentionally and knowingly did sexually penetrate [the victim,] and at the time of said sexual penetration, the said Defendant[] did cause the said victim to suffer bodily injury, by inserting a mop handle in her vagina, in violation of TCA 39-13-502 and against the peace and dignity of the State of Tennessee . . . .

**COUNT 2:**

And the Grand Jurors aforesaid, upon their oath aforesaid, do further present and say that on the date aforesaid, and in the State and County aforesaid, the said **RONNELL JASON DUPREE LEBERRY** . . . unlawfully, feloniously, intentionally and knowingly did sexually penetrate [the victim,] and at the time of said sexual penetration, the said Defendant[] did cause the said victim to suffer bodily injury, to-wit: by inserting a mop handle in her vagina, in violation of TCA 39-13-502 and against the peace and dignity of the State of Tennessee . . . .

The trial court gave the following jury instruction regarding unanimity of verdicts:

**MULTIPLE COUNTS: FINDING ON EACH REQUIRED**

The crime charged in each count of the indictment is a separate and distinct offense. You must decide each charge separately on the evidence and the law applicable to it. The defendant may be found guilty or not guilty of any or all of the offenses charged. Your finding as to each crime charged must be stated in your verdict.

**JURY: DELIBERATION**

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous . . . .

The Defendant contends that the State failed to elect facts upon which to establish separate acts of aggravated rape by the Defendant. Further, the Defendant asserts that the testimony presented at trial did not establish separate acts of aggravated rape. The State argues that no election issue arose as to the two aggravated rape counts because, in both counts, the indictment specifically charged sexual penetration by the insertion of a mop handle into the victim's vagina. Further, the State asserts that the evidence at trial clearly showed two separate acts of aggravated rape. After thoroughly reviewing the record, we agree with the State that no election issue arose as to the two aggravated rape counts.

A careful examination of the trial transcript shows that Grant testified about two separate and distinct incidents of aggravated rape. Grant testified that the Defendant inserted a mop handle into the victim's vagina slowly and then removed the mop handle to show to Grant. Grant testified that the Defendant penetrated the victim a second time with the mop handle and this time "he shoved it hard and it made her scream." Therefore, we conclude that no election issue arose regarding the two counts for aggravated rape because Grant's testimony about the two incidents corresponded exactly with the charges of aggravated rape in the indictment, thereby ensuring unanimous verdicts on those counts.[2] Thus, we conclude that the State was not required to elect offenses for the two aggravated rape counts, one and two, because the convictions in these counts were clearly based on the evidence of the two incidents involving sexual penetration of the victim's vagina with a mop handle. In our view, there is no danger that the jury created a "patchwork" verdict based on different offenses in evidence. This issue is without merit.

### C. Recusal of Trial Judge

The Defendant next contends that the trial court erred when it refused to recuse itself upon the Defendant's motion. Specifically, the Defendant asserts that the trial judge witnessed an assault committed by the Defendant against his previous counsel, which raised the question of the court's impartiality through the trial and at sentencing. The State contends that there is no evidence that the trial judge witnessed an assault, and, further, there is no evidence that the trial judge was biased.

At the hearing on the motion for new trial, the court stated:

> With respect to . . . the claim that the Court was biased and should not have conducted the trial, there simply just isn't any evidence to that. It is [the Defendant]'s contention, he surmises, he speculates that if the Court witnessed him assaulting [the Assistant Public Defender] in a case unrelated to the case that went to trial, that just because the Court saw that that somehow that just means that the Court is bias[ed] and should not preside in the trial in which he was convicted of the

---

[2] The jury convicted the Defendant of the lesser-included offense of facilitation to commit aggravated rape in each of the two counts alleging aggravated rape.

conviction that he is now complaining about. That is just what he thinks must be in the Court's mind, but there is absolutely nothing that the Court said or did, there is no evidence presented here, there is no legal argument that the court has heard that convinces the Court that it should not have presided or in the way that it presided somehow that [the Defendant] was denied due process and equal protection, there just simply - - I haven't heard it.

A trial judge should recuse himself or herself whenever the judge has any doubt as to his or her ability to preside impartially or whenever his or her impartiality can reasonably be questioned. State v. Pannell, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001). This is an objective standard. Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). "Thus, while a trial judge should grant a recusal whenever the judge has any doubts about his or her ability to preside impartially, recusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Id. The trial judge retains discretion over his or her recusal. State v. Smith, 906 S.W.2d 6, 11 (Tenn. Crim. App. 1995). Unless the evidence in the record indicates that the failure to recuse was an abuse of discretion, this court will not interfere with that decision. State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995).

The record in this case contains "nothing more than circumstances from which it might be inferred that the [t]rial [j]udge might have some reason to have . . . [an] unfavorable opinion" of the Defendant. Wiseman v. Spaulding, 573 S.W.2d 490, 493 (Tenn. Ct. App. 1978). The facts alleged are insufficient to warrant a finding by this Court that the trial judge committed reversible error by refusing to recuse himself. There is no evidence in the record to support this claim. Thus, we cannot conclude that the trial judge abused his discretion by denying the Defendant's motion to recuse the trial judge. This issue is without merit.

### D. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to support his convictions for facilitation of aggravated rape, aggravated assault, extortion, and especially aggravated kidnapping. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions

concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

## 1. Facilitation to Commit Aggravated Rape

The Defendant contends that the evidence was insufficient to support his conviction for facilitation to commit aggravated rape. The aggravated rape statute provides, in pertinent part, as follows, "Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . (2) The defendant causes bodily injury to the victim . . . ." Tenn. Code Ann. § 39-13-502 (a)(2) (1997). Tennessee Code Annotated section 39-11-403(a) defines "facilitation" as follows:

> A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

An instruction on facilitation addresses the Defendant's role in the crime as a facilitator and not as a party to the offense. See Locke, 90 S.W.3d at 672-73. In order for reasonable minds to find the Defendant guilty of facilitation of aggravated rape, the jury would have to conclude that the Defendant, although neither acting with the intent to promote aggravated rape nor benefitting in the results, provided substantial assistance knowing that Demetris Grant intended to commit aggravated rape. See Tenn. Code Ann. § 39-11-403(a).

After considering the evidence in the light most favorable to the State, we conclude that sufficient evidence exists in the record to support the Defendant's convictions for facilitation of aggravated rape. At trial, the victim testified that either the Defendant or Grant inserted a mop handle into her vagina. Grant testified that the Defendant inserted the mop handle into the victim's vagina twice. The record contains expert medical testimony that overwhelmingly supports the State's assertion that the victim suffered bodily injury from the incidents involving the mop handle. Further, the evidence presented at trial showed that Grant was charged with these crimes and received a ten-year sentence in exchange for her pleading guilty to kidnapping and testifying at the Defendant's trial. Further, Grant admitted that she started a fight with the victim because the victim failed to give Grant a ride to work, and the fight escalated into the criminal episode that became the basis for this trial. A reasonable jury could conclude that Grant was the principal party of the offense, and that the Defendant was the facilitator of the aggravated rape and provided substantial assistance in the commission of the offense. We conclude, therefore, that the evidence was sufficient

-17-

to support the Defendant's convictions for facilitation of aggravated rape.

## 2. Aggravated Assault

The Defendant next contends that the evidence is insufficient to sustain his conviction for aggravated assault. A person commits aggravated assault who "'intentionally . . . knowingly . . . or recklessly commits an assault" and either "causes serious bodily injury" or "uses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102 (1997). A person commits assault who "[i]ntentionally, knowingly or recklessly causes bodily injury to another. . . ." Tenn. Code Ann. § 39-13-101(a)(1) (1997). "Serious bodily injury" means bodily injury which involves: a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-106(a)(34) (1997).

Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of aggravated assault beyond a reasonable doubt. At trial, the victim testified that both the Defendant and Grant took turns heating a fork on the stove and burning her breasts and vagina while she was on the floor. Grant testified that the Defendant ordered the victim to get undressed and the victim did. Grant said that while she lit a cigarette on the stove, the Defendant handed her a fork and told Grant to place it on the stove. Grant testified that the Defendant then pressed the heated fork to the victim's breast. Grant's testimony was corroborated by the testimony of the victim and the medical evidence that was presented. Dr. Doty testified that the injuries to the victim's breasts would be extremely painful. We conclude, therefore, that the evidence was sufficient to support the Defendant's conviction for aggravated assault and this issue is without merit.

## 3. Extortion

The Defendant contends that the evidence is insufficient to support his conviction for extortion. A person commits extortion who "uses coercion upon another person with the intent to: (1) Obtain property . . . ." Tenn. Code Ann. § 39-14-112 (1997).

In the case under submission, the victim testified that the Defendant and Grant forced her, by threatening her life, to write a note to the Defendant and Grant that she owed them $250.00. She said that she was forced to agree that, until she could get them the money, her car would be used as collateral. Grant testified that the Defendant said that the victim should pay Grant back because the victim was the reason Grant missed work. She said that the Defendant told the victim to write down that Grant could keep the victim's car until the victim paid her. She also testified that the Defendant wanted his name on the paper because he would be driving the car. We conclude, therefore, that the evidence was sufficient to support the Defendant's conviction for extortion.

## 4. Especially Aggravated Kidnapping

The Defendant contends that the evidence is insufficient to sustain his conviction for especially aggravated kidnapping. Especially aggravated kidnapping is defined as "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty . . . where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-302, -305 (1997).

After considering the evidence in the light most favorable to the State, we conclude that sufficient evidence exists in the record to support the Defendant's conviction for especially aggravated kidnapping. The victim testified that the Defendant and Grant forcibly confined her to her home, and she suffered serious bodily injury as a result, that being burns to her breasts and vagina. Dr. Doty and the victim testified that the victim's burns resulted in extreme physical pain for the victim, which is a form of "serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(34) (1997). Further, the victim testified that the Defendant and Grant placed her in fear for her life and then the Defendant drove the victim, in the victim's own vehicle, to Grant's apartment where the victim was forced to perform various sexual acts. We conclude there is sufficient evidence to sustain the Defendant's conviction for especially aggravated kidnapping and, therefore, this issue is without merit.

### E. Impartial Jury

The Defendant contends that jurors considered evidence not submitted at trial, and, therefore, he was denied his right to trial by an impartial jury. The State asserts that the trial court did not abuse its discretion by determining that the jury did not act improperly. At the hearing on the motion for new trial, the Defendant testified that he was seated on the other side of the jury room wall and heard conversations from the jury room. The Defendant testified as follows:

> They were talking. I don't know if they were a juror or not, whoever was in that room right there, which is the jury room, you could hear them because the bench sits right against the wall right there.
>
> . . . .
>
> When I was sitting right there, there was a male and female, they got to talking and they was deliberating, they got loud, she said - - well, I know, my Mama was raped - - and I said . . . who was that? Then somebody made a comment like he said well my hand was burned. So I know how it feels to be burned. So I said all right, and I said I know who that is? That's a . . . juror.

At the hearing on the motion for new trial, the trial court found there was no extraneous prejudicial information or outside influence that was improperly brought before the jury. The trial court also stated:

> [E]ven if you look at what [the Defendant] said [the jurors] said, and even if you give - - assume that [the Defendant] is completely truthful about what he says he heard,

-19-

what he says he heard doesn't cause any concern about the validity of the verdict. There just simply isn't any evidence here today that would support setting aside a conviction on a claim that the jury did not deliberate properly and legally.

Article I, § 9 of the Tennessee Constitution provides that an accused has the right to be tried by "an impartial jury." The burden is on the defendant to establish jury misconduct. State v. Blackwell, 664 S.W.2d 686 (Tenn. 1984). While the defendant is entitled to a verdict untainted by extraneous, prejudicial information, there is also the importance of "maintaining inviolate the nature of jury deliberations." State v. Robert Emmet Dunlap, Jr., No. W1999-00027-CCA-R3-CD, 2000 WL 135754, at *2 (Tenn. Crim. App., at Jackson, Feb. 2, 2000), *no perm. app. filed*; see also Maldonado v. Missouri Pac. Ry., 798 F.2d 764, 770 (5th Cir. 1986). The trial court has the discretion to determine whether a jury has acted impartially. State v. Sammons, 656 S.W.2d 862, 869 (Tenn. Crim. App. 1982). Findings of fact made by the trial court regarding jury impartiality may only be overturned for "manifest error." State v. Cazes, 875 S.W.2d 253, 262 (1994); see also Dunlap, 2000 WL 135754, at *2. In the present case, the trial court found that no evidence of jury misconduct or jury impartiality existed. There is no evidence in the record to support the Defendant's contentions. We agree with the trial court's decision and conclude that the trial court did not abuse its discretion in determining that the jury did not act improperly. This issue is without merit.

### F. Recusal of Assistant District Attorney General

The Defendant next contends that the trial court erred when it denied his motion to recuse the Assistant District Attorney ("ADA") and the ADA should have recused himself because the ADA witnessed the Defendant assault his lawyer during an earlier part of the proceedings. In determining whether to disqualify a prosecutor in a criminal case, the trial court must determine whether there is an actual conflict of interest, which includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of "compromising interests and loyalties." See Tenn. R. Sup.Ct. 8, EC 5-1. If there is no actual conflict of interest, the court must nonetheless consider whether conduct has created an appearance of impropriety. See Tenn. R. Sup.Ct. 8, EC 9-1, 9-6. If disqualification is required under either theory, the trial court must also determine whether the conflict of interest or appearance of impropriety requires disqualification of the entire District Attorney General's Office. See State v. Tate, 925 S.W.2d 548, 550 (Tenn. Crim. App. 1995). The determination of whether to disqualify the office of the District Attorney General in a criminal case rests within the discretion of the trial court. Appellate review of such a ruling is limited to whether the trial court has abused its discretion. See id. at 50; State v. Culbreath, 30 S.W.3d 309, 312 (Tenn. 2000).

After thoroughly reviewing the record, we conclude that this issue is waived. The Defendant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). The

failure to do so results in a waiver of such issues. Id. Furthermore, the Defendant fails to make any citations in his brief to the record to support his contentions. See Tenn. Ct. Crim. App. R. 10(b) (stating "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The Defendant did not supplement the record on appeal with the motion to recuse the Assistant District Attorney. The record supplied contains only the motion to recuse for the trial judge. Therefore, the Defendant has waived our review of this issue.

Further, even if the Defendant had not waived this issue, we could not grant him the relief he seeks. At the hearing on the motion for new trial, the trial court stated, "With respect to the other grounds, the claim that there was a conflict of interest with the District Attorney's office . . . there simply just isn't any evidence to that." There is no evidence presented before us that shows that the trial court abused its discretion with regard to this issue.

### G. Defendant in Shackles During Trial

The Defendant contends that he was denied his right to a fair trial because he was required to wear shackles during trial. Specifically, he asserts that because he was restrained he was discouraged from testifying at his trial. The record contains no evidence about whether the Defendant was in shackles at trial. At the hearing on the motion for new trial, the trial court stated:

> [The Defendant] complains about wearing shackles. Again, whether he - - I don't specifically remember whether he had shackles on but I will just assume that he did. The fact that he had on shackles does not in and of itself, by itself, mean that he didn't get a fair trial. There has been nothing presented here today that would indicate that he was denied equal protection, due process, or that he was not given a fair trial because he had shackles on.

The Defendant bears the responsibility of presenting to this Court an adequate record from the trial court as to issues raised by the Defendant on appeal. Tenn. R. App. P. 24(b); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983). In the absence of an adequate record, this Court must presume that the trial court's ruling was supported by the evidence. State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). There is no evidence in the record concerning whether or not the Defendant was in shackles at his trial. Therefore, we must presume the trial court's determination was correct. Further, the Defendant fails to make any citations in his brief to the record to support his contentions. See Tenn. Ct. Crim. App. R. 10(b) (stating "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Accordingly, this issue is waived.

Nevertheless, even if we presume that the Defendant was in shackles during his trial and he did not waive this issue, there is no evidence that the trial court abused its discretion by restraining the Defendant with shackles. The decision of whether a defendant should be shackled during trial is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse

of that discretion. State v. Perry Thompson, No. 03C01-9606-CC-00228, 1997 WL 135408 (Tenn. Crim. App., at Knoxville, Mar. 25, 1997), *no perm. app. filed*. This issue is without merit.

## H. Racial Composition of the Jury

The Defendant contends that he was not tried by a jury of his peers because he is African-American and all of the jurors were Caucasian. We find nothing in the record that indicates the racial composition of the jury. Again, it is the Defendant's responsibility to present this Court with an adequate record from the trial court as to issues raised by the Defendant on appeal. Tenn. R. App. P. 24(b); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983). "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993); see also James David Alder v. State, No. M2003-02767-CCA-R3-PC, 2004 WL 2984845, at * 6 (Tenn. Crim. App., at Nashville, Dec. 16, 2004), *no perm. app. filed*. In the absence of an adequate record, this Court must presume that the trial court's ruling was supported by the evidence. State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Further, the Defendant has failed to cite authority in support of his argument. See Tenn. R. App. P. 27 (a)(7). Accordingly, this issue is waived.

## I. Sentencing

Finally, the Defendant contends that the trial court erred when it sentenced him. When a defendant challenges the length or manner of service of a sentence, it is the duty of this Court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999)); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts. Due to the trial court's sentencing errors, as set forth in this opinion, we must apply a de novo review without the presumption of correctness in this case.

# 1. <u>Blakely v. Washington</u>

The United States Supreme Court's recent opinion in <u>Blakely v. Washington</u>, 542 U.S. __, 124 S. Ct. 2531 (2004), calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in <u>Apprendi v. New Jersey</u>, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. 124 S. Ct. at 2537. The Court observed that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" 124 S. Ct. at 2537. Finally, the Court concluded that "every defendant has a *right* to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." <u>Id.</u> at 2539.

The Defendant asserts that his sentence is excessive in light of the United States Supreme Court decision in <u>Blakely v. Washington</u>, 542 U.S. __, 124 S. Ct. 2531 (2004). The State counters that the Defendant has waived this argument by not raising it in his original brief on appeal to this Court.

First, we note that the Defendant has not waived this issue. In <u>State v. Chester Wayne Walters</u>, we held that, because <u>Blakely</u> announced a new rule, any defendant whose case was still on direct appeal could raise this issue. <u>State v. Chester Wayne Walters</u>, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at *19 (Tenn. Crim. App., at Nashville, Nov. 30, 2004). We explained that, although <u>Blakely</u> was the Supreme Court's explanation of its prior decision in <u>Apprendi v. New Jersey</u>, 566 U.S. 466, 490 (2000), the Tennessee Supreme Court had previously announced that the rule in <u>Apprendi</u> did not affect our State's sentencing scheme. As a result, the mandate of <u>Blakely</u> created a new rule in Tennessee. Furthermore, in <u>Walters</u>, this Court held that <u>Blakely</u> could be raised in all cases on direct appeal, because a violation of this mandate was plain error arising from the deprivation of the Constitutional right to a jury trial. <u>See also</u> <u>State v. Charles Benson</u>, No. M2003-02127-CCA-R3-CD, 2004 WL 2266801, at *7–10 (Tenn. Crim. App., at Nashville, Oct. 8, 2004).

Thus, the question becomes whether the sentence imposed by the trial court violates the United States Supreme Court mandate in <u>Blakely</u>. At the Defendant's sentencing hearing, the trial court applied multiple enhancement factors to the Defendant's sentence, including the following: (3) that the defendant was a leader in the commission of an offense involving two or more criminal actors; (6) that the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; (7) that the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great; and (17) that the crime was committed under circumstances under which the potential for bodily injury to a victim was great.

See Tenn. Code Ann. § 40-35-4-114 (3), (6), (7), (17) ( 2003).[3]  The trial court then sentenced the Defendant as follows:  Count 1, facilitation to commit aggravated rape, a Class B felony, ten years; Count 2, facilitation to commit aggravated rape, a Class B felony, ten years; Count 4, aggravated assault, a Class C felony, six years; Count 5, extortion, a Class D felony, four years; Count 6, especially aggravated kidnapping, a Class A felony, twenty-two years and six months.  The trial court ordered that the Defendant must serve the sentence for the especially aggravated kidnapping conviction, as a violent offender pursuant to Tennessee Code Annotated section 40-35-120 (2003), which requires that the sentence be served at 100%.  The trial court ordered that Count 1, Count 2, Count 4, and Count 5 run concurrently to one another but consecutively to Count 6.  Thus, the Defendant was sentenced to an effective sentence of thirty-two years and six months.

The sentence range for Class A felony, Range I offenders is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (2003).  In calculating the sentence for a Class A felony, the presumptive sentence is the midpoint of the range, in the absence of enhancement and mitigating factors.  Tenn. Code Ann. § 40-35-210 (c) (2003).  If there are enhancement factors but no mitigating factors, the sentence must be set at or above the midpoint of the range.  Tenn. Code Ann. § 40-35-210(d).  If there are mitigating factors but no enhancement factors, the trial court must set a sentence at or below the midpoint of the range.  Tenn. Code Ann. § 40-35-210(d).  If there are both mitigating and enhancement factors, the trial court must adjust the sentence based on the weight it assigns to each factor.  Tenn. Code Ann. § 40-35-210(d).

In calculating the sentence for a Class B, C, or D felony conviction, the presumptive sentence is the statutory minimum for a Range I offender if there are no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210 (c).  If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range.  Tenn. Code Ann. § 40-35-210(d).  A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence.  Tenn. Code Ann.§ 40-35-210(e).  The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Tenn. Code Ann. § 40-35-210(e).  The sentence range for a Range I offender for a class B felony is not less than eight years or more than twelve years, for a class C felony is not less than three years or more than six years, and for a class D felony is not less than two years or more than four years.  Tenn. Code Ann. § 40-35-112 (2003).

None of the enhancement factors used by the trial court to enhance the Defendant's sentence were submitted to a jury or admitted by the Defendant.  Therefore, the rule in Blakely precludes application of any of these factors, and the Defendant's sentence must be modified, unless the error was harmless beyond a reasonable doubt.  See Walters, 2004 WL 2726034, at *22.

In Walters, this Court held that Blakely violations are subject to a Constitutional harmless

---

[3] Beginning July 4, 2002, "the 2002 amendment [to Tennessee Code Annotated section 40-35-114] added present [enhancement factor] (1) and redesignated former (1) through (22) as present (2) through (23), respectively." Tenn. Code Ann. § 40-35-114, Amendments (Supp. 2002).

error analysis. Id. at *24. "While it is true that <u>Blakely</u> concerns the inviolate right to a jury trial, the cornerstone upon which our criminal justice system was constructed, we cannot say that a jury's failure to determine an enhancement factor 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" Id. (quoting <u>Needer v. United States</u>, 527 U.S. 1, 9 (1999)). Thus, before we modify the Defendant's sentence, we will "review the <u>Blakely</u> errors to determine whether they were harmless beyond a reasonable doubt." Id.; see <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967).

We conclude that none of the enhancement factors used by the trial court to enhance the Defendant's sentence were submitted to a jury or admitted by the Defendant. Therefore, the rule in <u>Blakely</u> precludes application of any of these factors, and the application of each of these factors was error. Furthermore, none of these errors were harmless beyond a reasonable doubt. The Defendant's sentences must be modified under <u>Blakely</u> as follows: Count 1, facilitation to commit aggravated rape, a Class B felony, is modified from ten years to eight years; Count 2, facilitation to commit aggravated rape, a Class B felony, is modified from ten years to eight years; Count 4, aggravated assault, a Class C felony, is modified from six years to three years; Count 5, extortion, a Class D felony, is modified from four years to two years; Count 6, especially aggravated kidnapping, a class A felony, is modified from twenty-two years and six months to twenty years. Therefore, we hold that the Defendant must serve an effective sentence of twenty-eight years, with the twenty year sentence for especially aggravated kidnapping to be served as a violent offender at 100%.

### 2. Consecutive Sentencing

The Defendant argues that the trial court erred by ordering his sentences to run consecutively. When sentencing the Defendant, the trial court stated the following:

> In conjunction with weighing the enhancement factors the [c]ourt considers 40-35-115, which has to do with whether sentences should be served concurrently or consecutively. Under subsection four the [c]ourt is authorized to order sentences to be served consecutive.
>
> . . . .
>
> Over a period of hours the victim was ordered to remove her clothes, to lie on a kitchen floor. She was vaginally penetrated on two separate occasions with a mop handle. A red-hot dinner fork was placed to each breast. She was branded in that fashion. It was reheated. It was then placed in the vaginal area where it caused a burn so severe that swelling took place to the point that the victim was unable to [urinate]. The labia was penetrated, burned, if you will, and it required reconstructive surgery.
>
> She had to be placed under general anesthetists so that she could be treated because of the extreme sensitivity when doctors tried to work on her.

She was forced in the car. Driven across town, or driven to a different location where she was forced to engage in numerous sex acts.

She was the victim of behavior that indicated little or no regard for human life; where there was no hesitation about committing a crime in which the risk to human life was high; and the offender was certainly dangerous during the period of time.

The trial court then ordered "The [c]ourt orders counts one, two, four and five to be served concurrently but consecutive to count six for an effective sentence of thirty-two and a half years."

Pursuant to Tennessee Code Annotated section 40-35-115(a), if a defendant is convicted of more than one criminal offense, the court shall order the sentences to run either consecutively or concurrently. The trial court may order sentences to run consecutively if the court finds by a preponderance of the evidence certain criteria enumerated in Tennessee Code Annotated section 40-35-115(b)(1)-(7). Tennessee Code Annotated section 40-35-115(b)(4) provides that a trial court may find that consecutive sentencing is proper where: "The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." In addition to the specific criteria in Tennessee Code Annotated section 40-35-115(b), consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." Tenn. Code Ann. §§ 40-35-102(1) and -103(2); State v. Imfeld, 70 S.W.3d 698, 707 (Tenn. 2002).

In Kern, this Court held that, for a defendant to qualify as a dangerous offender, the record must establish that:

(1) the defendant's behavior indicates little or no regard for human life and he did not hesitate in committing a crime in which the risk to human life is high; (2) the circumstances surrounding the commission of the offense are aggravated; (3) confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and his resort to criminal activity and furtherance of his anti-societal lifestyle; and (4) the aggregate length of the sentences reasonably relates to the offenses for which the defendant stands convicted.

Kern, 909 S.W.2d 5, 8 (citing State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991)); see State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976).

After thoroughly reviewing the evidence presented at the sentencing hearing, we conclude that the trial court properly sentenced the Defendant to consecutive sentences based upon the fact that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. The crimes

committed against the victim were severe and showed a lack of regard for human life and the circumstances surrounding the crimes were aggravated. Further, the trial court stated:

> The Court is mindful that sentences imposed be no greater than that deserved for the offense committed, and that the sentence imposed should be the least severe measure to achieve the purposes for which the sentence is imposed. The Court has also considered the potential or lack of potential for rehabilitation of the Defendant.

The trial court did not err by ordering that the Defendant's conviction for especially aggravated kidnapping run consecutively to the other concurrent sentences. This issue is without merit.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm all of the Defendant's convictions. Further, we modify the Defendant's sentence to an effective sentence of twenty-eight years, twenty of which for the especially aggravated kidnapping conviction must be served at 100%.

_____
ROBERT W. WEDEMEYER, JUDGE