Enrique **MALDONADO,**
**Plaintiff-Appellee,**

v.

**MISSOURI PACIFIC RAILWAY COM-**
**PANY, Defendant-Appellant.**

**No. 85–2164.**

United States Court of Appeals,
Fifth Circuit.

Aug. 27, 1986.

Rehearing Denied Oct. 1, 1986.

Todd for exemplary damages, and that ruling   remains in effect.

Person, Whitworth, Ramos, Borchers & Morales, Donato D. Ramos, Mark D. Willett, Laredo, Tex., for defendant-appellant.

Arnulfo Gonzalez, Jr., Laredo, Tex., for plaintiff-appellee.

Before RANDALL and GARWOOD, Circuit Judges, and SCHWARTZ,* District Judge.

GARWOOD, Circuit Judge:

Defendant Missouri Pacific Railroad Company appeals from a judgment in favor of its employee, plaintiff Enrique Maldonado, who sued Missouri Pacific under the Federal Safety Appliance Act (FSAA), 45 U.S.C. § 2, for injuries he sustained in attempting to align a drawbar on one of defendant's railroad cars during a train car switching operation. Missouri Pacific asserts several errors, including the claim that the district court erred by instructing the jury that it is a violation of the FSAA "for the railroad to operate a car which has a draw bar sufficiently out of line that it does not couple on impact." We hold that, because Missouri Pacific did not produce evidence that would support a defense based on drawbar misalignment, if we were to adopt such a defense, the instruction is not erroneous in the context of this case. Finding that defendant's contentions present no reversible error, we affirm.

**Facts and Proceedings Below**

The facts, for the most part, are undisputed. On February 1, 1981, Maldonado, employed as a switchman by Missouri Pacific, was a member of a four-man crew engaged in switching operations at Missouri Pacific's train yard in Laredo, Texas. The crew was assigned to make up an outbound train by linking specified cars together in accordance with a switch list. In making up this train, the crew was required to switch a TTX flatcar from Track No. 6 to Track No. 4 and to link it up with cars already on Track No. 4. The TTX car was to be the lead car (behind the engine) on the outbound train. The crew planned to couple the TTX car to the next car on Track No. 4 and then shove the line

of connected cars southward down the track to make room for other trains.

The crew went onto Track No. 6 and pulled several cars, including the TTX car, northward onto the main track until they were north of the intersection between the tracks. The engine then came southward on to Track No. 4 with the purpose of "throwing" or "kicking" the TTX car down the track to couple with those cars already on the track. This involved uncoupling the TTX car and using the engine to set the TTX car rolling about four miles per hour toward the next car on the track, which was about a block away. Both cars were equipped with drawbars that had automatic couplers designed to connect upon impact. Before kicking the TTX car down the track, plaintiff Maldonado observed that the TTX drawbar was properly aligned and he opened the knuckle on the coupler.[1] After the TTX car was sent down the track, Maldonado heard the TTX car strike the next car.

The engine returned the remaining cars to Track No. 6 and then came back to Track No. 4. At this point, the engine coupled with the TTX car by backing directly into it. The engineer then pulled forward or northward to "stretch out" the cars to ensure that they were connected before they were shoved southward. Maldonado noticed that the TTX car had failed to couple to the second car in line and saw that the drawbars on both cars were misaligned. He then aligned the drawbar on the second car. Next, he attempted to align the TTX drawbar, but was unable to do so. He signaled to another crew member who came to assist him. During their concerted efforts to align the TTX drawbar, Maldonado injured his back.

Maldonado filed this action against Missouri Pacific, seeking compensation for his injuries originally under the FSAA and the

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

1. The evidence established that automatic couplers do not operate unless at least one of the knuckles at the end of the couplers is opened and both drawbars are sufficiently in line to

connect. *See also Clark v. Kentucky & Indiana Terminal R.R.*, 728 F.2d 307, 310–11 (6th Cir. 1984); *United Transportation Union v. Lewis*, 711 F.2d 233, 235 (D.C.Cir.1983); *Metcalfe v. Atchison, Topeka & Santa Fe Ry. Co.*, 491 F.2d 892, 896 (10th Cir.1974).

Federal Employers Liability Act (FELA). Plaintiff dismissed his FELA action during trial, but obtained a favorable jury verdict on his FSAA claim.

## Discussion

*Federal Safety Appliance Act*

■ Section 2 of the FSAA, 45 U.S.C. § 2, provides:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

The broad purpose of the FSAA was the requirement of equipment for automatic coupling to avoid the great risks incurred by the railroad employees in going between the cars. *St. Louis & San Francisco R.R. Co. v. Conarty*, 238 U.S. 243, 35 S.Ct. 785, 786, 59 L.Ed. 1290 (1915); *United Transportation Union v. Lewis*, 711 F.2d 233, 243–47 (D.C.Cir.1983); *Southern Pacific Co. v. Mahl*, 406 F.2d 1201, 1203 (5th Cir. 1969). Section 2 imposes absolute liability upon a railroad for injuries sustained when the automatic couplers fail to perform "on the occasion in question." *Affolder v. New York, C. & St. L.R. Co.*, 339 U.S. 96, 70 S.Ct. 509, 510, 94 L.Ed. 683 (1950); *Carter v. Atlanta & St. Andrews Bay Ry. Co.*, 338 U.S. 430, 70 S.Ct. 226, 229, 94 L.Ed. 236 (1949). Therefore, neither the diligence of the railroad nor the absence of a specific defect in the coupler is relevant to a finding of liability. *Carter*, 70 S.Ct. at 229; *O'Donnell v. Elgin, Joliet & Eastern Ry. Co.*, 338 U.S. 384, 70 S.Ct. 200, 204, 94 L.Ed. 187 (1949); *Coleman v. Burlington Northern, Inc.*, 681 F.2d 542, 544–45 (8th Cir.1982). In fact, no question "regarding the normal efficiency of the couplers" is material to an FSAA action. *Affolder*, 70 S.Ct. at 510.

■ The railroads may take comfort, however, in at least one clearly established defense. In *Affolder*, the Supreme Court stated that failure of the equipment to function is a violation, assuming "that the coupler was placed in a position to operate on impact." *Id.* at 511; *see also Carter*, 70 S.Ct. at 229. The *Affolder* Court thus found that the railroad had a good defense if neither of the couplers was in an open position so as to operate on impact. 70 S.Ct. at 511. The courts have been reluctant to extend the general language of *Affolder* beyond the facts of that case. Therefore, the requirement that the coupler be placed in position to operate has widely been interpreted as referring to the necessity of opening the knuckle on at least one of the couplers. *See Clark v. Kentucky & Indiana Terminal R.R.*, 728 F.2d 307, 312–13 (6th Cir.1984); *Hallada v. Great Northern Ry.*, 244 Minn. 81, 69 N.W.2d 673, 680, *cert. denied*, 350 U.S. 874, 76 S.Ct. 119, 100 L.Ed. 773 (1955); *White v. Atchison, Topeka & Santa Fe Ry. Co.*, 244 S.W.2d 26, 28–30 (Mo.1951), *cert. denied*, 343 U.S. 915, 72 S.Ct. 648, 96 L.Ed. 1330 (1952); *Schaaf v. Chesapeake & Ohio Ry. Co.*, 113 Mich.App. 544, 317 N.W.2d 679, 681 (1982), *cert. denied*, 464 U.S. 848, 104 S.Ct. 153, 78 L.Ed.2d 142 (1983). Of course, because the FSAA violation must be a causative factor in the plaintiff's injuries, the railroad in appropriate circumstances may raise a sole cause defense. *Beimert v. Burlington Northern, Inc.*, 726 F.2d 412, 414 (8th Cir.) (no liability under FSAA if plaintiff's negligence is *sole* cause of injuries), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2659, 81 L.Ed.2d 365 (1984).[2]

The issue in the present case is whether the district court erred in instructing the jury that it is a violation of the FSAA "for the railroad to operate a car which has a draw bar sufficiently out of line that it

---

2. In *O'Donnell*, the Supreme Court stated: "We do not say that a railroad may never effectively defend under the Act by showing that an adequate coupler failed to hold because it was broken or released through intervening and independent causes other than its inadequacy or defectiveness such, for example, as the work of a saboteur." 70 S.Ct. at 206 n. 7.

does not couple upon impact." Both parties contend that the cars failed to couple because of drawbar misalignment before the impact. Their dispute concerns the legal significance of this theory. Defendant urges us to read *Affolder* to mean that there can be no FSAA violation unless at least one knuckle was opened *and* the drawbars were properly aligned before the attempted coupling.[3] However, we need not determine when, if ever, a railroad may rely on drawbar misalignment because Missouri Pacific did not produce the evidence that would be required at a minimum to support such a defense.

■ We believe that, because the FSAA is essentially an equipment safety statute, drawbar misalignment prior to impact may not support a defense unless the misalignment is due to some factor other than equipment failure or defect. After an extensive examination of the language of the Act and its legislative history, a panel of the D.C. Circuit concluded that section 2 was intended only to prescribe mandatory safety equipment. *Lewis,* 711 F.2d at 244–45. The court held:

> "[T]he scope of section 2 is confined to the requirement that railroad cars be 'equipped' with automatic couplers that can be operated without the necessity of men going between the ends of the cars.... The predicate for liability under section 2 is the failure to provide equipment that functions as the statute commands." *Id.* at 251.

Our examination of the FSAA and its legislative history leads us to agree that the FSAA is equipment oriented and "does not address operating procedures." *Id.* at 245;

see also *Conarty,* 35 S.Ct. at 786. This suggests that drawbar misalignment should be a defense to failure to couple in instances where the misalignment which causes the noncoupling does not reflect defective or failed equipment.

■ Some courts holding essentially that *any* misalignment that prevents coupling is a violation apparently *assume* that proper equipment ordinarily cannot be moved so far out of line that it fails to couple. *See, e.g., Clark,* 728 F.2d at 312–13 (couplers "out of alignment beyond the normal play" will not couple automatically); *Hallada,* 69 N.W.2d at 680; *Buskirk v. Burlington Northern, Inc.,* 103 Ill.App.3d 414, 59 Ill.Dec. 125, 431 N.E.2d 410, 412, cert. denied, 459 U.S. 910, 103 S.Ct. 217, 74 L.Ed.2d 173 (1982). Whether or not a proper coupler within normal operation can become misaligned enough to prevent coupling, we believe that, if a railroad may raise a defense of misalignment, it must, at the least, produce evidence tending to show that the misalignment was *not* due to equipment failure or defect. Evidence that the drawbars were misaligned so as to prevent coupling places a burden on the railroad to produce evidence tending to show a separate cause for the failure to couple. This is so because a failure to couple due to a deficiency in the equipment, such as a drawbar with more lateral play than is appropriate for normal operation, clearly amounts to a violation of the FSAA. Here there is no evidence suggesting a cause or explanation for misalignment of the drawbar (or even that the drawbar was misaligned).[4] Therefore, we do not have to

---

3. Relying on *Affolder* and *Cobb v. Union Ry. Co.,* 318 F.2d 33 (6th Cir.), *cert. denied,* 375 U.S. 945, 84 S.Ct. 352, 11 L.Ed.2d 275 (1963), defendant requested the following instruction:

> "You're further instructed that the mere failure of two cars to couple on impact does not establish a violation of the Safety Appliance Act. Before a failure to couple establishes a defective coupler, it must be found that it was properly set so it could couple. If it was not adjusted and aligned as such, automatic couplers must be—as must be, the failure is not that of the coupler."

Although *Affolder* and *Cobb* both indicate that there can be no violation unless the couplers are "properly set," neither case defines "properly set" to mean properly aligned.

4. Because some courts have held that railroads are responsible for injuries suffered while attempting to align a drawbar in preparation for coupling even though no coupling attempt has been made, *see, e.g., Clark,* 728 F.2d at 312–13, Missouri Pacific might assert that the impact itself provides a nonequipment cause for the post-impact misalignment. However, Missouri Pacific cannot rely on the impact in this case,

decide whether Missouri Pacific, with appropriate evidence, could have raised a defense of misalignment, because Missouri Pacific did not produce any evidence that would sustain an instruction on such a defense. The district court is not free to instruct the jury on an issue of law on which there is no evidence. *Neubauer v. City of McAllen, Texas,* 766 F.2d 1567, 1575 (5th Cir.1985); *Ware v. Reed,* 709 F.2d 345, 352 (5th Cir.1983). Based on the facts of this case, we hold that the district court's instruction is not erroneous.

### *Rule 606(b)*

#### 1. *Juror Testimony*

Missouri Pacific argues that the district court abused its discretion by denying Missouri Pacific's post-verdict motion to obtain juror testimony pursuant to Rule 606(b) of the Federal Rules of Evidence.[5] Defendant requested leave of the district court to obtain an affidavit or deposition of Narcisa C. Valdez, who had contacted defense counsel by telephone after the trial to state that the jury had substantial discussions concerning defendant's wealth and about giving the benefit of the doubt to the plaintiff. Defendant sought to procure Valdez's affidavit or testimony to this effect in support of its motion for new trial. The district court denied the motion to obtain testimony and the motion for new trial.

The district court has broad discretion in deciding whether to grant a new trial based on juror misconduct and in the methods used to gather evidence to decide the new trial motion. *Carson v. Polley,* 689 F.2d 562, 580 (5th Cir.1982); *Martinez v. Food City, Inc.,* 658 F.2d 369, 372 (5th Cir.1981).

When a party seeks to impeach a jury's verdict, "evidence on the private thought processes of individual jurors will not be received. The subjective thoughts and emotions that may have influenced a juror's deliberations are shielded from inquiry.... Evidence of extraneous matters that may have reached the jury and affected its deliberations, however, may be offered." *Id.* at 580–81 (citations omitted); *see also Haeberle v. Texas International Air Lines,* 739 F.2d 1019, 1021 (5th Cir. 1984).

■ The district court did not abuse its discretion in denying the new trial motion or in denying defendant the opportunity to obtain a statement from Valdez. Defendant made no suggestion to the court that Valdez would testify concerning any extraneous prejudicial information or outside influence on the jury. Valdez's comments to Missouri Pacific's attorney only concerned matters beyond the scope of proper inquiry. Because the party seeking to question jurors post-verdict must make a "preliminary showing of misconduct," *Wilkerson v. Amco Corp.,* 703 F.2d 184, 186 (5th Cir.1983), the court acted within its discretion in denying the inquiry. *See also O'Rear v. Fruehauf Corp.,* 554 F.2d 1304, 1309–10 (5th Cir.1977).

Defendant relies upon *Vezina v. Theriot Marine Service, Inc.,* 554 F.2d 654 (5th Cir.1977), a personal injury suit in which we remanded for a hearing to determine if the jury was prejudiced by remarks made by the forewoman concerning a large personal injury suit pending against her. The forewoman had not disclosed the pending litigation when questioned during voir dire,

---

because there was no evidence concerning the cause of the proposed misalignment that prevented coupling and thus led to the impact.

**5.** Fed.R.Evid. 606(b) provides:
"**Inquiry into validity of verdict or indictment**
"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes."

but disclosed the information during a subsequent voir dire in another case. On remand, the district court questioned the jurors and found that the verdict was free from prejudice, which was affirmed upon appeal. 610 F.2d 251, 252 (5th Cir.1980). In *Martinez*, a case similar to *Vezina*, we upheld the exclusion of post-verdict evidence of one juror's description of experience with the employment practice at issue and another juror's statements that the jury should find against the employer for hiring Mexican nationals. 658 F.2d at 372–73. The district court in *Martinez* stated that evidence of jury deliberations was inadmissible under Rule 606(b), but it considered evidence tending to show that a juror had misrepresented or intentionally concealed information during voir dire. On appeal, we distinguished *Vezina*, because the *Vezina* trial court initially conducted *no* inquiry into juror misconduct although a hearing was necessitated by the facts. In *Martinez*, we found that "once the district court concluded that no concealment had taken place during the *voir dire,* further inquiry became academic." 658 F.2d at 375.

■ Missouri Pacific argues that the jurors should have disclosed their prejudices in response to defense counsel's voir dire questions concerning the jurors' ability to treat Missouri Pacific like any other individual. However, defendant's motion did not indicate to the district court that any juror had concealed information during voir dire. *Vezina* involved circumstances suggesting that a juror had failed to disclose important information about an extraneous matter that could have affected deliberations. In the present case, Missouri Pacific sought to examine the jurors about their subjective thoughts during deliberations. Its motion did not indicate that any juror believed he or she would be unable to treat Missouri Pacific fairly but concealed that fact during voir dire. The testimony sought by Missouri Pacific clearly concerned matters shielded from inquiry by Rule 606(b).

### 2. *Due Process*

■ Missouri Pacific further contends that application of Fed.R.Evid. 606(b) violated its due process right to a fair and impartial jury. Defendant argues that the Rule is designed to prevent harassment of jurors and therefore should not prevent voluntary disclosure of jury misconduct. Of course, jurors may voluntarily disclose any misconduct. But the district court can receive testimony or grant a new trial only if the voluntary disclosure relates to "extraneous prejudicial information" or "outside influence" on the jury, or false information (or withholding) given on voire dire. The subjective thought processes of the jurors generally do not amount to "jury misconduct" that can support a new trial motion.

■ Rule 606(b) therefore protects jurors from harassment and supports the finality of verdicts. *See Carson*, 689 F.2d at 581; *United States v. D'Angelo*, 598 F.2d 1002, 1004–05 (5th Cir.1979). The defendant's right to a fair trial is not absolute; it may be outweighed by other considerations, including the jury's right to privacy and protection from harassment. *Cf. Haeberle*, 739 F.2d at 1021–22 (any First Amendment rights litigant may have to interview jurors may be outweighed by other considerations, including jury privacy). In addition, Rule 606(b) also promotes fair trials by encouraging free discussion in the jury room. Rule 606(b) strikes a constitutional balance, protecting the defendant's right to a fair trial from substantial juror misconduct, while protecting other legitimate interests as well.

### *Closing Argument*

■ Missouri Pacific contends that the district court abused its discretion in denying its motion for new trial based on plaintiff's improper remarks during closing argument. Plaintiff's counsel suggested during his closing that the jury should give the benefit of the doubt to the working man instead of the corporation. This, of course, was clearly improper. However, the district court immediately instructed

the jury that the plaintiff and defendant should be treated equally.[6] Defendant did not object nor move for mistrial based on these remarks. In its charge to the jury, the district court stated that a corporation is to be treated equally under the law and is entitled to a fair trial. The court also explained that the plaintiff bears the burden of proving his case.

The district court's refusal to grant a new trial based on this remark is reviewed under the abuse of discretion standard, because "the trial judge is in the best position to evaluate the impact on the jury of the attorney's conduct, and to determine the most effective response to ensure a fair trial." *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1123 (5th Cir.1984). Although the remark was wholly improper, the district court immediately informed the jury that corporations are treated as any other party and repeated this admonition in its charge. In somewhat analogous circumstances, we have held that similar action cured any error. *See, e.g., South Hampton* at 1123–24; *Dixon v. International Harvester Co.*, 754 F.2d 573, 585–86 (5th Cir.1985). *See also Frederick v. Mobil Oil Corp.*, 765 F.2d 442, 449 (5th Cir.1985).

Although the district court instructed the jury before defendant's counsel could have objected, defendant's failure to thereafter move for mistrial may be a factor favoring affirmance. By "acquiescing in the court's corrective charge," defendant "got a chance to see the verdict and then seek to overturn it." *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 782 (5th Cir.1983). Because of the district court's curative instructions, and because defendant chose to gamble on the verdict, we find that the district court correctly denied defendant's motion for new trial.

*Limited Cross-Examination*

■ Plaintiff originally sued defendant under the FELA and the FSAA. During trial, at the conclusion of the direct examination of plaintiff, but before defendant's cross-examination of plaintiff, plaintiff's counsel dropped the FELA cause of action. During cross-examination, defendant's counsel questioned Maldonado about his awareness of Missouri Pacific's safety rules. The district court prohibited much of defendant's cross-examination inquiry into the training, instructions, or knowledge that plaintiff had for the performance of his job and the moving of the drawbars. The district court determined that defense counsel was attempting to elicit evidence of contributory negligence, which was irrelevant to the remaining FSAA claim. Missouri Pacific argues that he should have been allowed to inquire into all matters raised by direct examination and that the questioning pertained to Maldonado's credibility.

The district court has broad discretion in limiting cross-examination, and its judgment will be disturbed only in instances of clear abuse. *Winans v. Rockwell International Corp.*, 705 F.2d 1449, 1457 (5th Cir. 1983). As we observed above, it is well settled that evidence of plaintiff's contributory negligence is not relevant in an action based on violation of the FSAA. *Affolder v. New York, C. & St. L.R. Co.*, 339 U.S. 96, 70 S.Ct. 509, 510, 94 L.Ed. 683 (1950). Furthermore, any relevance that such cross-examination may have had to Maldonado's credibility is minimal. Missouri Pacific was not prejudiced by the district court's limitation of this cross-examination because defense counsel was permitted some questioning on this matter and was permitted cross-examination about other matters bearing on Maldonado's credibility. Yet, defendant's counsel repeatedly attempted to elicit testimony from Maldonado concerning his training and the care he took that night. Because this evidence was cumulative and its probative value minimal, we conclude that the district court

---

**6.** The district court explained to the jury:

"All parties in this court, ladies and gentlemen, will be treated as equal. You're not here to give the benefit of the doubt to one person or another, you're here to decide whether one side has proved its case, and I'm going to instruct you that corporations are to be treated exactly as equal as anyone else, and if you do anything to the contrary, you're violating the law."

did not abuse its discretion in limiting cross-examination about Maldonado's contributory negligence.

**Conclusion**

Finding that Missouri Pacific's claims present no reversible error, the judgment of the district court is

AFFIRMED.