IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 10, 2011

**STATE OF TENNESSEE v. WILLIAM DARELLE SMITH**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-C-2675     Seth Norman, Judge**

**No. M2010-01384-CCA-R3-CD - Filed March 2, 2012**

A Davidson County jury convicted the Defendant, William Darelle Smith, of first degree premeditated murder, and the trial court sentenced the Defendant to serve a life sentence in the Tennessee Department of Correction. The Defendant appeals his conviction, claiming the following: (1) the trial court erred when it allowed the Defendant's girlfriend to testify about threatening statements the Defendant made two or three days before the victim's murder; (2) the evidence is insufficient to support his conviction; and (3) the trial court erred when it failed to inquire into possible juror misconduct. After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, J., joined. THOMAS T. WOODALL filed a concurring opinion.

Emma Rae Tennent (on appeal), Joan Lawson (at trial), and Michael Engle (at trial), Nashville, Tennessee, for the appellant, William Darelle Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Chris Buford and Katy Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Background**

This case arises from the murder of a woman named Zurisaday Villanueva. A Davidson County grand jury indicted the Defendant for the premeditated first degree murder, charging that he shot and killed the victim. At the Defendant's trial, the parties presented the following

evidence: Luz Villanueva, the victim's mother, testified that her daughter had been married to the Defendant and that the two had not been married for "long" at the time of the victim's death.

James Pearson testified that on June 4, 2007, he drove to work on Briley Parkway a little after 5:00 a.m. As he exited Briley Parkway onto the Ashland City exit ramp, he noticed an individual lying face-down on the side of the road. Pearson pulled over, got out of his car, and walked toward the individual thinking maybe it was someone who had "too much to drink or passed out." Pearson explained that he had previously been employed as a medic in the military, where he had been trained to talk to an individual as he approached. Accordingly, he spoke to the person lying on the ground, but he received no response. He touched the victim's shoulder "to kind of shake her" but noticed that "she was cold," so he stepped away and called 9-1-1. Pearson described the area where he found the victim as "pretty rural" with very little traffic at that time of the morning.

Officer James Pearce, a Metropolitan Nashville Police Department officer, testified that when he arrived on the scene he checked the victim's pulse and then called an ambulance. Officer Pearce said that it appeared as though there had been a "scuffle" in the gravel area right next to the pavement of the exit ramp. On the other side of the gravel area, there was a grassy area where the victim's body lay.

Officer Thomas Simpkins, a Metropolitan Nashville Police Department officer, testified that he collected two spent .9 millimeter shell casings at the crime scene. One was found lying near the victim and the other on the ground closer to the exit ramp road. He attempted to recover fingerprints from the casings but was unable to do so. Officer Simpkins testified that police officers made a plaster cast mold of two locations at the scene, one of a car tire impression and the other of a possible shoe impression.

Officer Simpkins testified that on June 8, 2007, he reported to the Defendant's apartment and collected a .9 millimeter gun and ammunition. Officer Simpkins processed the gun and ammunition for fingerprints, but he was unable to develop any usable fingerprints.

Nakeda Kirby, the Defendant's cousin, testified that the Defendant and the victim came to her real estate office in March 2007, seeking to buy a house. Kirby had never met the victim, whom the Defendant introduced as his wife. Kirby said that she found a house for the couple, but, when it came close to the closing date, the victim's finances "fell through."

Kirby said that, at some point thereafter, Kirby learned of the victim's death and spoke with the Defendant about it. Kirby recalled that the Defendant told her that the Defendant and the victim were fighting when the victim brandished a gun. The Defendant and the victim

struggled over possession of the gun, the gun went off, and a bullet from the gun hit the victim. The Defendant told Kirby that, once the victim was shot, he tried to move her, and the victim reached up and grabbed his hand, which caused the gun to fire again. Kirby said that, at the time the Defendant relayed these events to her, she was unaware that the victim had been shot twice. Kirby said that she asked the Defendant why he did not call the police when the shooting occurred, and the Defendant told Kirby that he "panicked."

On cross-examination, Kirby agreed that the Defendant had discussed purchasing a house with Kirby before March 2007, when the Defendant first introduced Kirby to the victim. During this earlier conversation, the Defendant stated he was interested in purchasing a house in the price range of $129,000 to $132,000. At the time he brought the victim with him to discuss purchasing a house, the Defendant looked for homes in a price range between $300,000 and $750,000.

William Cecil Smith, the Defendant's father, testified that he owned a 1994 white Lincoln car in June 2007. At that time, Smith had given the Defendant possession of the car. Smith said that he and his son had a disagreement over the car because, for insurance purposes, Smith did not want anyone driving it other than the Defendant. Due to this disagreement, Smith said that, on June 5, 2007, he and his son drove the Lincoln to Chicago and left it with his daughter. Smith recalled that the Defendant was acting "peculiar" during this period of time.

Smith testified that, when they returned from Chicago, Smith learned that the Defendant's "girlfriend"[1] had been killed. When asked what Smith did in response to learning this information, he said, "I tried to get him to turn himself in." Smith said that he found the Defendant in a car at Cedar Hill Park holding his .9 millimeter handgun, which the Defendant normally carried for protection. When Smith found the Defendant in Cedar Hill Park, he believed the Defendant was going to try and kill himself, so Smith "talked him out of it." Smith denied telling police that he talked with the Defendant at the park about the Defendant's fears about the consequences of shooting the victim. The State presented Smith with a police report that indicated that Smith told police he talked with his son about his fear of the consequences of shooting the victim. Smith, however, maintained that he did not recall telling police about a discussion of this nature. Smith agreed that, since this incident, he had suffered a stroke, which had affected his memory.

Julia Crawford testified that she had dated the Defendant for the past "two or three

---

[1]Various witnesses identified the victim as the Defendant's girlfriend while others identified the victim as the Defendant's wife. We refer to the victim as each witness did during our summary of the evidence each witness presented.

years." Crawford recalled that on a Friday night in June 2007, she and the Defendant went out and had a couple of drinks. The Defendant and Crawford went to the Defendant's apartment, but Crawford said she felt sick and asked the Defendant to take her home. When the two got into the car to go to Crawford's home, the Defendant said, "Man that is [the victim] down there." To which Crawford replied, "Okay."

Crawford testified the Defendant indicated that the victim had a gun, and he then placed his gun in Crawford's lap, telling her that he wanted her to kill the victim. Crawford told the Defendant, "what are you talking about, I need to go and get something to eat, I'm hungry, I'm sick." The Defendant then told her that he was just joking and only said that to see how she would react. Crawford said that the Defendant's comments were said in a "joking" manner, but, when she looked at his face and expression, she believed he was serious. The Defendant drove Crawford home and pulled in her driveway. Crawford gathered her belongings from the car and, when she looked up, the Defendant held a gun to her head. Crawford said that the Defendant told her "You better not cry, you cry I'm going to kill you. . . . Are you gonna be with me, you gonna stand by my side[?]" To which Crawford responded, "I will do anything." Crawford said that she gave this response only because she wanted to get out of the Defendant's car. The Defendant then laid his gun down, told Crawford he loved her and gave her a kiss before she exited his vehicle.

Crawford testified that she had never seen the victim before but that the victim had called her cell phone numerous times claiming that the victim and the Defendant were in a relationship and living together. On Sunday night, the Defendant called Crawford and told her he wanted to talk. The Defendant came over to Crawford's home and told Crawford that the victim was dead. Crawford said that she got up off the couch and started crying. She said, "There was so many emotions and thoughts going through my head." Crawford said that she kept asking what happened, and the Defendant finally said that he killed the victim. Crawford described that Defendant as "not himself."

Patrick Smith, a Chicago police detective, testified that Detective Mike Roland contacted him in June 2007 requesting his assistance in locating a 1994 Lincoln Town Car for a Nashville homicide investigation. Detective Smith said that he drove to the address Detective Roland provided and observed a vehicle matching the description provided by Detective Roland parked at the address. Based upon Detective Roland's instruction, Detective Smith impounded the vehicle and ordered a forensic officer to process the vehicle for evidence. Later, Detective Roland collected the evidence and vehicle in Chicago.

On cross-examination, Detective Smith testified that, after the Lincoln Town Car was in police custody, the driver's side window was broken. Detective Smith agreed that it appeared that someone got into the Lincoln Town Car after Chicago Police took custody of the

vehicle.

Leonard Stocker, a Chicago Police Department forensic investigator, testified that, in June 2007, he processed a 1994 Lincoln Continental involved in a Nashville homicide. Investigator Stocker said that the driver's side door window was broken and there was bullet damage to the left rear passenger door. Investigator Stocker observed a blood drip on the front passenger seat headrest and collected the blood for analysis. After processing the car with a chemical reagent for blood, Investigator Stocker swabbed five locations for blood analysis, located in the front passenger area of the car, the steering wheel and the driver side rear passenger seat. Investigator Stocker collected a red-stained towel from the rear passenger side floorboard.

Mike Roland, a Metropolitan Nashville Police Department detective, testified that he was assigned to investigate the homicide in this case. When he arrived at the scene, the victim's body was still present. Police officers were unable to locate any identification for the victim but found a receipt for the RiverGate/Madison Walmart dated the previous night. Using the date and time stamped on the receipt, Detective Roland obtained video surveillance from the Wal-Mart. The video depicted the victim driving into the parking lot in a white Lincoln Continental. The victim was alone and had duplicate keys made in the sporting goods section of the Wal-Mart and then left. According to the time on the video surveillance, the victim left at approximately 6:30 p.m. and was at the Wal-Mart for approximately thirty minutes.

Detective Roland testified that eventually he learned the victim's identity from her fingerprints after the body was transported to the Medical Examiner's office. After learning her identity, police were able to identify her family. Detective Roland spoke with the victim's sister, who indicated that the victim was living with her husband in "some apartments in the RiverGate/Goodlettsville area." Although the victim's sister could not provide a name or address for the apartment complex, she described how to get to the apartment complex. Based on these instructions, Detective Roland found the Defendant's apartment.

Detective Roland testified that police executed a search warrant on the Defendant's apartment and found mail and papers bearing the victim's name. Additionally, police found a social security card with the Defendant's name, a rifle, .9 millimeter ammunition, and two spent .9 millimeter shell casings that did not match the shell casings found at the crime scene.

During the course of his investigation, Detective Roland learned of the Defendant's mother's address. When Detective Roland went to this address, the Defendant's father answered the door and was "very cooperative," providing information about the location of the white Lincoln Continental. When the Defendant came downstairs, police officers took him into custody. The Defendant's mother gave consent to search her house, and police found a

.9 millimeter handgun, which did not match the murder weapon. Detective Roland said that he traveled to Chicago to collect the white Lincoln Continental and evidence gathered from the car. Upon his return, he submitted blood samples taken from the car to the Tennessee Bureau of Investigation ("TBI") for analysis. Detective Roland also had tire impressions collected from the white Lincoln Continental, but they did not match the plaster cast made at the crime scene.

Dr. Adele Lewis, an Assistant Medical Examiner, testified as an expert witness in the area of forensic pathology. Dr. Lewis testified that there were two gunshot wounds to the victim's body. One was located on the left side of the back of the victim's head and the other was located on the victim's torso. In addition to these injuries, there were some superficial scrapes and bruising to the victim's face, arms, and hip. Dr. Lewis said that the gunshot wound to the victim's torso may not have "necessarily" been fatal if the victim had received immediate medical attention. If she had not received immediate medical attention, she would have bled to death from the torso wound. The gunshot wound to the victim's head, however, was a fatal wound. Dr. Lewis opined that it was unlikely the victim could have recovered from the head wound even with immediate medical attention. Dr. Lewis testified that the cause of death was gunshot wounds to the torso and head and the manner of death was homicide.

Charles Hardy, a TBI forensic DNA analyst, testified as an expert witness in the field of DNA analysis. Agent Hardy conducted a screen for the presence of blood from the five samples taken from the Lincoln Continental and isolated any DNA to compare with the known sample from the victim in this case. The DNA matched the victim for two of the samples, which were taken from the front passenger door control panel and the front passenger headrest. Partial profiles were obtained for the three other samples taken from the car, and they were consistent with a mixture of genetic material from at least two individuals, one of whom was male. Special Agent Hardy said that he confirmed that two of the five samples showed the presence of blood, the two matching the victim's DNA, and the other three samples contained residuals of human DNA even thought they did not contain blood.

Based upon the evidence, the jury convicted the Defendant of first degree premeditated murder. The trial court ordered the Defendant to serve a life sentence for the first degree murder conviction. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant claims that: (1) the trial court erred when it allowed the Defendant's girlfriend to testify about threatening statements the Defendant made to her two or three days before the victim's murder; (2) the evidence is insufficient to support his convictions; and (3) the trial court erred when it failed to inquire into possible juror

misconduct.

## A. Julia Crawford's Testimony

The Defendant asserts that the trial court erred when it admitted Ms. Crawford's testimony because her testimony about statements made by the Defendant constitute evidence of some other crime or bad act, which should have been excluded under Tennessee Rule of Evidence 404(b). The State responds that the trial court properly admitted the evidence because it was relevant to show the Defendant's premeditation and intent to kill the victim.

Prior to trial, the State filed a notice of intent to present the testimony of Ms. Crawford regarding statements made by the Defendant two days prior to the victim's murder. The State sought to introduce two separate incidents occurring within a short period of time on the Friday night before the victim's murder. The first instance was when the Defendant and the victim were leaving the Defendant's apartment and the Defendant told Crawford he saw the victim. He placed a gun in Crawford's lap and told her, "I want you to kill her." After Crawford maintained that she wanted to go home, the Defendant told her he was merely "joking" and wanted to see how she would respond to such a request. After making a stop for food, the Defendant took Crawford home. As she gathered her belongings to exit his car, he held a gun to her head and asked if Crawford was going to "stand by" him. The trial court held a jury-out hearing on this matter, during which the State argued that these statements established the Defendant's state of mind with regard to the homicide close in time to the victim's murder. The State asserted that the evidence established that the Defendant had the intent to kill the victim and this intent pre-existed in his mind before the shooting. The State offered to present the testimony, however, defense counsel summarized for the trial court the "factual passages" at issue. The trial court made the following ruling:

> Under 404(b) the Court is required to have a jury-out hearing with regard to the matter, and then the Court must determine whether there is a material issue that exists in the conduct.

> It would appear to me that the State has pointed out that the mind of the defendant, even though it is from Friday until Sunday or Monday, is a material issue with regard to this particular case, and it is a question the jury is going to have to determine in the matter. I am going to allow her to testify to both incidents.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible" unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id*. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to

the determination of the action more probable or less probable than it would be without the evidence." *Id*. at 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id*. at 403.

Evidence of a defendant's character offered for the purpose of proving that the defendant acted in conformity with that character is not admissible. *Id*. at 404(a). Additionally, evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person to show action in conformity with that character. *Id*. at 404(b). Such evidence may be admissible, however, for "other purposes." *Id*. Our Supreme Court has determined that such "other purposes" include demonstrating motive or intent. *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). Such evidence is admissible for other purposes provided that the trial court: (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on evidence of prior crimes, wrongs, or acts. *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002). When a trial court substantially complies with the procedural requirements of Rule 404(b), the standard of appellate review of the trial court's decision is abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *State v.. James*, 81 S.W.3d 751, 759 (Tenn. 2002). If the strict requirements of the rule are not substantially observed the reviewing court gives the trial court's decision no deference. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

In allowing the Defendant's statements to be admitted into evidence during the trial, the trial court found that Crawford's testimony was offered to show the premeditation and the intent of the Defendant. The trial court did not make a clear and convincing evidence determination and did not comment on the balance of probative value versus prejudicial effect.

In our view, the trial court in this case did not substantially comply with the procedural requirements of Rule 404(b). Accordingly, we review the trial court's decision to admit evidence of the prior statements of the Defendant *de novo* without any deference to the decision.

Pursuant to our *de novo* review, we conclude that the trial court correctly ruled that the prior instances of misconduct were admissible under Rule 404(b). We first note that the Defendant never raised any argument as to whether Ms. Crawford was untruthful in her account. We find nothing in the record that brings into question the credibility of Ms.

Crawford's testimony. We conclude that the evidence is clear and convincing that the Defendant made these statements to Ms. Crawford.

Next, in the context of homicide prosecutions, acts indicating the relationship between the victim and the defendant prior to the commission of the offense are relevant to show a defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); *State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982); *State v. Glebock*, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981). Further, this evidence is probative on the issue of premeditation. *See State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993). We do not view the evidence as being merely evidence of propensity to commit a crime as condemned in *State v. Parton*, 694 S.W.2d 299, 203 (Tenn. 1985). In *Harris v. State*, 227 S.W.2d 8 (Tenn. 1950), our Supreme Court stressed that evidence that a defendant had committed another crime, wrong, or act was not admissible unless such evidence tended directly to prove his guilt of the offense. The statements made by the Defendant to Ms. Crawford are relevant to the issue of premeditation. The Defendant stated his desire that the victim be killed. The Defendant's statements that preceded the shooting are also relevant to prove an absence of mistake and that the fatal shooting was not accidental. *DuBose*, 953 S.W.2d at 654.

In our view, the probative value of the evidence outweighed the danger of unfair prejudice. The Defendant's statements were offered not to show the Defendant's propensity to commit a crime, but as relevant evidence to show that he killed the victim intentionally and with premeditation. The Defendant is not entitled to relief as to this issue.

## B. Sufficiency of the Evidence

The Defendant claims that the evidence presented at trial is insufficient to convince any rational trier of fact that he is guilty of premeditated first degree murder. The State responds that the jury could reasonably infer that the Defendant intentionally shot and killed the victim and that this murder was premeditated. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505

S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W .2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In the case under submission, the Defendant was convicted of first degree murder. First degree murder is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). Whether a defendant has acted with premeditation is an issue for the finder of fact to determine, and it may be inferred from the manner and circumstances of the killing. *State v. Holder*, 15 S.W.3d 905 (Tenn. Crim. App. 1999). Facts which may be

indicative of premeditation include: the use of a deadly weapon on an unarmed victim; the shooting of the victim after the victim has turned to retreat or escape; the lack of provocation on the part of the victim; the defendant's declaration of his intent to kill; procurement of a weapon; multiple wounds; and the defendant's failure to render aid to the victim. *State v. Lewis*, 36 S.W.3d 88, (Tenn. Crim. App .2000); *State v. Robert L. Evans, Jr.*, No. W2002-02744-CCA-R3-CD, 2004 WL 2439257, at *7 (Tenn. Crim. App., at Jackson, Oct. 29, 2004), *no Tenn. R. App. P. 11 application filed*.

Considering the evidence in the light most favorable to the State, the proof at trial showed that the Defendant had an intimate relationship with the victim. Papers and mail bearing the victim's name were found at the Defendant's apartment. The Defendant introduced the victim to his cousin as his wife when the couple were attempting to buy a home together. The victim's mother also believed the Defendant and victim were married. At some point, the relationship with the victim deteriorated and the Defendant went out on a Friday night with his girlfriend of two or three years, Crawford. The Defendant identified the victim and placed his pistol in Crawford's lap, asking her to kill the victim. Shortly thereafter, he threatened Crawford with the same pistol, asking if she is going to stand by him. The Defendant admitted to both his cousin and Crawford that he killed the victim, providing specific facts of the case to his cousin that were previously unknown to her. Wal-Mart video surveillance showed the victim driving the Defendant's car just hours before her death, and the victim's blood was found in the Defendant's car. The Defendant and his father drove the car to Chicago immediately after the victim's death. The victim's body was found face down on the side of the road with two fatal gunshot wounds. Based upon this evidence, we conclude that a jury could find the Defendant guilty of first degree premeditated murder. The Defendant is not entitled to relief as to this issue.

### C. Possible Juror Bias

The Defendant argues that the trial court erred in failing to conduct further investigation into improper contact between a juror and a State's witness. The State responds that the trial court properly denied the Defendant's request for further inquiry into possible juror misconduct, and that the Defendant fails to show any prejudice as a result of the trial court's decision.

After the jury returned its verdict and was dismissed, the trial court directed the Defendant to rise for his sentence. The following exchange then occurred between defense counsel and the trial court:

DEFENSE COUNSEL: Your Honor, I wondered if, before the jury departs the courthouse, if given the events of this morning it would be appropriate if The

Court inquired of this particular juror regarding any information that he might have acquired other than what has been made available to The Court?

TRIAL COURT: No, I'm satisfied with the communication that I have gotten from Dr. Lewis with regard to the matter. He filled us in fully on the matter and he told me that is exactly what was said and I am satisfied with it.

Nothing in the record documents any previous discussion regarding "the events of this morning." In the Defendant's motion for new trial, the Defendant provides the following account:

> The Court erred in denying defense counsel's request made at the conclusion of the case to question juror Glenn Scott Mitchell regarding improper communications with witnesses and/or other jurors during the trial proceedings. During the deliberation process, the Court was made aware of the fact Juror Mitchell had communicated with witness Dr. Adele Lewis following her testimony. The Court was satisfied no improper information was shared during that communication. However, at the conclusion of the trial, Defense Attorney J. Michael Engle requested that Juror Mitchell be questioned regarding any other improper communications he may have had with other witnesses or jurors.

Also included in the record is an agreed order making the following findings:
1. During the trial, this Court received the attached email from trial witness Adele Lewis, documenting communications between Lewis and trial juror Glenn Scott Mitchell.

2. The trial court provided copies of this email to trial counsel.

3. An issue regarding this email and the communications documented therein was raised by the defendant in his new trial motion and was considered by this Court in denying the defendant's motion.

4. The parties agree to certify this email printout as part of the appellate record in this matter pursuant to Tennessee Rule of Appellate Procedure 24(e).

The attached "email printout" is an email from the medical examiner, Adele Lewis, who testified at trial. The attachment contained the following Facebook exchange between her and juror Scott Mitchell and Dr. Lewis's statement to the trial court about the exchange:

-12-

Scott Mitchell: "A-dele!! I thought you did a great job today on the witness stand . . . I was in the jury . . . not sure if you recognized me or not!! You really explained things so great!!"

Adele Maurer Lewis: "I was thinking that was you. There is a risk of a mistrial if that gets out."

Scott Mitchell: "I know . . . I didn't say anything about you . . . there are 3 of us on the jury from Vandy and one is a physician (cardiologist) so you may know him as well. It has been an interesting case to say the least."

I regret responding to his email at all, but regardless I felt that this was a fairly serious violation of his responsibilities as a juror and that I needed to make you and general Miller aware. I did not recognize the above-referenced cardiologist or any other jurors.

Article I, § 9 of the Tennessee Constitution provides that an accused has the right to be tried by "an impartial jury." The burden is on the defendant to establish jury misconduct. *State v. Blackwell*, 664 S.W.2d 686 (Tenn. 1984). While the defendant is entitled to a verdict untainted by extraneous, prejudicial information, also to be considered is the importance of "maintaining inviolate the nature of jury deliberations." *State v. Robert Emmet Dunlap, Jr.*, No. W1999-00027-CCA-R3-CD, 2000 WL 135754, at *2 (Tenn. Crim. App., at Jackson, Feb. 2, 2000), *no perm. app. filed*; *see also Maldonado v. Missouri Pac. Ry.*, 798 F.2d 764, 770 (5th Cir. 1986). The Defendant must establish "that as the result of a juror's contact with a third person some extraneous prejudicial information, fact or opinion was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors." *Id.* The trial court has the discretion to determine whether a jury has acted impartially. *State v. Sammons*, 656 S.W.2d 862, 869 (Tenn. Crim. App. 1982). Findings of fact made by the trial court regarding jury impartiality may only be overturned for "manifest error." *State v. Cazes*, 875 S.W.2d 253, 262 (1994); *see also Dunlap*, 2000 WL 135754, at *2.

In the present case, the trial court found no evidence that the jury was affected by the e-mail communication between Dr. Lewis and juror Mitchell. The Defendant has the burden of showing something more than mere interactions between the jury and third persons. *State v. Blackwell*, 664 S.W.2d 686, 689 (Tenn. 1984). The juror's communication with Dr. Lewis appears to be a social communication rather than one in which the juror is seeking extraneous and improper information about the case. We conclude that the trial court did not abuse its discretion when it denied the Defendant's request for further inquiry into possible juror misconduct. The Defendant is not entitled to relief as to this issue.

## III. Conclusion

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE